Opinion issued February 5, 2004
















In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00086-CV




F.S. NEW PRODUCTS, INC. AND 
TESCO AMERICAN, INC. d/b/a TESCO/WILLIAMSEN, Appellants

V.

STRONG INDUSTRIES, INC. AND BROOKS STRONG, Appellees




On Appeal from the 11th District Court
Harris County, Texas
Trial Court Cause No. 99-00011




OPINION ON MOTION FOR REHEARING

          Appellant Tesco American, Inc. d/b/a Tesco/Williamsen (“Tesco”) has filed a
motion for rehearing and a motion for rehearing en banc. We deny rehearing, but
withdraw our opinion and judgment of September 11, 2003 and issue this new
opinion in its stead. Accordingly, we deny the motion for rehearing en banc as moot.


 
          Appellees, Brooks Strong and Strong Industries, Inc. (collectively referred to
as “the Strong Plaintiffs”), sued appellants, F.S. New Products, Inc. (“FSNP”) and
Tesco American, Inc. d/b/a Tesco/Williamsen (“Tesco”), for fraud, breach of contract,
misappropriation of trade secrets, and conspiracy, alleging appellants had wrongfully
obtained and used the Strong Plaintiffs’ trade secrets related to the design and
manufacture of dump truck trailing axles. FSNP and Tesco appeal from a judgment
awarding the Strong Plaintiffs actual and punitive damages, attorney’s fees, and
permanent injunctive relief. FSNP and Tesco each filed individual briefs with
numerous multi-pronged issues, which can be reduced to the following dispositive
issues: (1) whether federal patent law preempts the Strong Plaintiffs’ state law claims;
(2) whether legally and factually sufficient evidence was presented to support the
jury’s finding that Tesco committed fraud; (3) whether Tesco preserved its objection
to the trial court’s failure to instruct the jury on the proper measure of fraud damages;
(4) whether legally and factually sufficient evidence was presented to support the
damage award against Tesco for fraud; (5) whether the Strong Plaintiffs were entitled
to punitive damages against Tesco; (6) whether the breach of contract and
misappropriation of trade secret damages awarded against FSNP were an
impermissible “double recovery”; (7) whether the trial court erred in awarding
attorney’s fees against FSNP; and (8) whether the trial court erred in granting the
Strong Plaintiffs permanent injunctive relief. 
          We affirm in part and reverse and render in part.
Factual and Procedural History
The Strong Plaintiffs
          Strong Industries manufactures trailing axles for dump trucks. A trailing axle
is a load-bearing axle that extends out visibly behind a truck. By increasing the
truck’s length and the number of tires that a truck has on the ground, the trailing axle
enables a truck to carry an increased load, while still complying with federal weight
restrictions. 
          Brooks Strong (“Brooks”) began designing and manufacturing trailing axles
in the mid-1980s. Brooks’s first trailing axle, the “100 series,” was a twin arm axle
made for concrete trucks. In 1985, Brooks put a 100 series trailing axle on a dump
truck. At that time, no other trailing axles were available for dump trucks on the open
market, and no company had ever developed a dump truck trailing axle that had been
successfully marketed for any length of time. 
          Between 1986 and 1989, Brooks engaged in research relating to the dump truck
industry and trailing axles. In 1988, Brooks incorporated Strong Industries. Through
Strong Industries, Brooks continued to develop a series of trailing axles known as the
“Strong Arm.” In 1989 and 1990, the Strong Plaintiffs developed and marketed the
200 series and 300 series. Unlike the 100 series, both the 200 and 300 series had a
single arm rather than a twin arm. The 200 and 300 series also had other design
features that were intended to be improvements over the 100 series. Even after the
production of the 200 and 300 series, Strong Industries continued to develop the
Strong Arm. In the early 1990’s, Strong Industries developed and produced the 400
and 600 Strong Arm series.


 The 400 and 600 had design features that differed from
the previous Strong Arm series. Each series, from the 100 through the 600,
represented an evolutionary step for the Strong Arm. 
          A feature common to all of the series was that the trailing axle attached to the
frame of the dump truck below the truck’s load. Attaching the trailing axle to the
frame destabilized the truck. The destabilization could be remedied by attaching a
twin arm trailing axle to the bed of the truck above the load. However, such an
attachment had never been successful because it resulted in the narrowing of the
truck’s bed, which in turn decreased the truck’s carrying capacity. The Strong Arm
700 series solved this problem. In 1991, Brooks conceived of an idea to design a
twin arm trailing axle that attached to the corner posts of the truck’s bed, rather than
the truck’s frame. Because the attachment would be in-line with the sides of the bed,
it would not detract from the width of the bed or adversely impact the load-carrying
capacity of the truck. Brooks’s idea later became the Strong Arm 700 series.
Tesco
          Tesco manufactures dump beds for dump trucks. In early 1992, John Newburn,
Tesco’s general manager, approached Strong Industries about becoming a dealer of
the Strong Arm trailing axle. On April 6, 1992, Bill Brugger, Tesco’s president,
signed a dealer agreement with Strong Industries. As required by the dealership
agreement, Brugger, on behalf of Tesco, also signed a non-competition agreement
that included a non-disclosure of information provision. The non-competition
agreement was attached to the dealership agreement as “Exhibit A.” The non-competition agreement provided in relevant part as follows: 
1.Covenant Not to Disclose Confidential Information
          A.[Tesco] acknowledges that, in and as a result of his [sic]
association with [Strong Industries], he [sic] shall be
making use of, acquiring and/or adding to confidential
information of a special and unique nature and value
relating to certain matters of [Strong Industries]. Such
matters may include the procedures, manuals, purchasing
information, pricing policies, financial information,
confidential reports and lists of customers of [Strong
Industries].
 
B.As a material inducement to [Strong Industries] to engage
in business with [Tesco], [Tesco] agrees that he [sic] shall
not, except with prior written consent of [Strong
Industries], directly or indirectly, disclose, transfer or use,
for any purpose whatsoever, any of such confidential
information which has been obtained by or disclosed to
him as a result of his association with [Strong Industries].
 
. . . .
 
2.Covenant Not to Compete
 
A.It is recognized and understood by the parties hereto that
[Tesco], through his association with [Strong Industries],
has acquired a considerable amount of knowledge and
goodwill with respect to the business of [Strong Industries]
which are extremely detrimental to [Strong Industries] if
used by [Tesco] to compete with [Strong Industries]. It is
therefore, understood and agreed by the parties hereto that,
because of the nature of the business of [Strong Industries]
and [Tesco], it is necessary to afford fair protection to
[Strong Industries] from competition by [Tesco].
 
B.As a material inducement to [Strong Industries] to do
business with [Tesco], [Tesco] agrees that for a period
commencing with the date hereof and ending eighteen
months after termination of business with [Strong
Industries], he [sic] shall not engage directly, indirectly or
in concert with any other person or entity, in the business
of manufacturing, selling, or distributing any device of the
type(s) in which [Strong Industries] engages, within the
territorial jurisdiction of the United States. 
          At trial, Brooks provided the following explanation regarding why he required
Tesco to sign a non-compete and non-disclosure agreement: 
Q:Why is it that you wanted [Tesco] to enter into a dealership
agreement and also a noncompetition agreement?
 
A:We had spent years and years developing trailing axles. We
learned a lot - - got a lot of education. We learned a lot over the
years. We learned a lot of the dos and a lot of the don’ts. Like I
explained to [Tesco], I am not going to hand you a gun to shoot
me with.
 
Q:What does that mean?
 
A:That means I am not going to teach you all these things, which
you would have to learn if you are a dealer, and then have you
come back and compete with me. I wouldn’t, under any
circumstances, ever teach these people what they needed to know
unless I had some protection. It would be insanity.
 
Q:It’s just an arm and an axle behind a truck. It is not rocket
science, is it?
 
A:Well . . . not that it had never been done before, but every
invention has a certain amount of evolution that it goes through. 
Each one that is done leads you to the next step and the next step
and the next step. We had gone through a lot of steps, and that
took years to do that.
          Over the course of the dealership relationship, Strong Industries shared its
confidential and proprietary information with Tesco. This included providing Tesco
with a Strong Arm sales manual. The manual was stamped privileged and
confidential; it contained information derived from the Strong Plaintiffs’ many years
of experience building trailing axles and included technical drawings of the Strong
Arm. Strong Industries also taught Tesco how to build a “super dump,” which is the
industry term for a dump truck with a trailing axle. Brooks testified at trial that
Strong Industries educated its dealers about the super dump manufacturing process
because it believed a dealer could better market and sell a super dump if the dealer
understood how the product was made. 
FSNP
          FSNP assists other companies in designing and patenting products. Less than
three months after signing the non-compete agreement with Strong Industries, on
June 29, 1992, Tesco contracted with FSNP to develop a trailing axle known as the
“Maximizer.” Fred Smith, an engineer employed by FSNP, worked on the Maximizer
design. Around this same time, Tesco’s president, Bill Brugger, approached Brooks
Strong about producing the Maximizer. Brugger showed Brooks drawings of the
Maximizer design and an engineer data book. The Maximizer design had a twin arm,
which attached to the truck’s frame. Without going into detail, Brooks informed
Brugger that the Maximizer design would not work. Because of its flaws, Brooks did
not consider the Maximizer to be a threat to his Strong Arm series. When Brugger
said that someone may produce the Maximizer, Brooks responded that he hoped
someone would. The Maximizer was never produced.
          In early 1993, Tesco representatives began encouraging Brooks to hire Smith. 
Because he had always done his own design work, Brooks was reluctant to use Smith,
but based on the recommendation of Tesco representatives, Brooks hired Smith to
work on the Strong Arm 700 series. In July 1993, Brooks sent Smith a non-compete
and non-disclosure agreement. Smith declined to sign the agreement but instead
forwarded a different non-disclosure agreement to Brooks. Because he viewed it as
“one-sided,” Brooks refused to sign the non-disclosure agreement sent by Smith. 
          Smith came to Houston to meet with Brooks in August 1993. Brooks and
Smith discussed the parameters of the work that Smith would do for Strong
Industries. Smith worked on the Strong Arm 700 series for four or five months. The
design for the 700 series was completed at the end of 1993. The first Strong Arm 700
series trailing axle was sold in March 1994.
          Smith also assisted Strong Industries in filing a patent application for the 700
series in December 1993; the patent was granted in 1998. The 700 series had two
features that distinguished it from previous trailing axles: the attachment of the axle
to the corner posts of the bed and the location of the wheels. At trial, Brooks testified
that both of these features had been thought of and sketched before Smith was hired
to work on the 700 series. Brooks hired Smith to work out the technical details of the
design and to perform a computer “finite element analysis.” Such analysis allowed
Smith to test the design without requiring Strong Industries to incur the expense of
building a prototype of the new series.
The Maxle
          FSNP, and Smith specifically, had been doing business with Tesco for a
number of years before Smith was hired by Strong Industries to work on the 700
series. After the development and production of the Strong Arm 700 series, Smith
continued to do work for Tesco. On October 23, 1996, FSNP and Tesco signed a
contract regarding the development of another trailing axle. The contract recited that
Tesco had “conceived” an idea for a trailing axle and that FSNP would develop the
idea to make it marketable. The Tesco trailing axle was called “the Maxle.” Smith
worked on the project and drew the Maxle design for Tesco.
          In August 1997, Tesco and FSNP contracted with Silent Drive, Inc. to
manufacture the Maxle. Tesco began selling the Maxle in 1997. Between 1997 and
1999, Tesco sold 33 Maxles, and Silent Drive directly sold 12 Maxles to other
customers. Under the terms of the August 1997 contract, Tesco and FSNP were
entitled to receive royalties on the Maxles directly sold by Silent Drive. 
          Like the Strong Arm 700 series, the Maxle is a twin arm trailing axle that
attaches to the truck bed, rather than the frame. Other than the Strong Arm 700 series
and the Maxel, no other trailing axle has ever had such a design. At trial, the Strong
Plaintiffs’ expert witness, Tom Grubbs, a mechanical engineer, testified that the
Maxle’s design is “almost one for one derivative of the Strong Arm.” After
comparing the Strong Arm 700 series trailing axle with the Maxle, Grubbs concluded
that the two were “incredibly similar.” He stated, “If we were to do a DNA check on
the two designs, we would find the father of both of them was Brooks Strong.”
The Lawsuit
          On October 18, 1998, counsel for the Strong Plaintiffs sent a letter to Tesco.
The letter notified Tesco that it was in violation of the non-compete agreement and
requested an accounting of all “non-Strong trailing axles” sold by Tesco.
          On January 4, 1999, Strong Industries filed suit against Tesco for breach of
contract. Brooks Strong later joined as a plaintiff and FSNP was later added as a
defendant. In “Plaintiffs’ Fifth Amended Original Petition,” the live pleading at the
time of trial, the Strong Plaintiffs asserted causes of action for fraud, breach of
contract, misappropriation of trade secrets, and conspiracy against Tesco and FSNP. 
The Strong Plaintiffs also requested that Tesco, FSNP (and any other party acting in
concert with them) be permanently enjoined from manufacturing the Maxle or any
other product using the Strong Plaintiff’s “confidential information.” Tesco filed a
counterclaim against Strong Industries alleging fraud, breach of contract, and tortious
interference with contract. The case was tried and submitted to the jury on all
theories of recovery asserted by the parties.
          The jury made positive liability findings against Tesco on all causes of action
and awarded the Strong Plaintiffs $700,000 for breach of contract, $675,000 for
fraud, $1.2 million for misappropriation of trade secrets, and $1 million in exemplary
damages associated with the fraud finding. With regard to the claims against FSNP,
the jury made positive liability findings on the following causes of action: breach of
contract, misappropriation of trade secrets, and conspiracy. The jury awarded the
Strong Plaintiffs $250,000 for misappropriation of trade secrets and $65,000 for
breach of contract against FSNP. The jury found no liability against Strong Industries
with regard to Tesco’s counterclaim. 
          The Strong Plaintiffs elected to have judgment rendered against Tesco on the
jury’s award for fraud and exemplary damages, and against FSNP based on the breach
of contract award. In compliance with this request, the trial court rendered judgment 
awarding the Strong Plaintiffs (1) $675,000 in actual damages and $1,000,000 in
exemplary damages against Tesco based on the jury’s findings related to fraud, and
(2) $65,000 in actual damages against FSNP based on the jury’s breach of contract
findings. The trial court also awarded $300,000 in reasonable attorney’s fees for
trying the case against Tesco. In addition, the trial court made the following award
of reasonable attorney’s fees against Tesco and FSNP jointly and severally: (1)
$30,000 for trial, (2) $10,000 for an appeal to an appellate court, and (3) $5,000 for
filing a petition for review with the Texas Supreme Court. 
          The judgment also ordered that Tesco, FSNP, and Silent Drive be permanently
enjoined from designing and manufacturing trailing axles, including the Maxle, that
are based on Strong Industries’ trade secrets and from disseminating such trade
secrets. The judgment further ordered that Tesco and FSNP turn over all information
relating to the Strong Arm and the Maxle to Brooks Strong. 
          Both Tesco and FSNP appeal the trial court’s judgment.

Discussion 
A.      Preemption by Federal Patent Law
          In its fourth issue, FSNP contends that the Strong Plaintiffs’ causes of action
for breach of contract, misappropriation of trade secrets, and conspiracy to
misappropriate trade secrets should be dismissed because they are preempted by
federal patent law.


 FSNP argues that these causes of action are based on the Strong
Plaintiffs’ claims that the Maxle was a copy of the patented design of the 700 series. 
          According to the United States Supreme Court, “[S]tate regulation of
intellectual property must yield to the extent that it clashes with the balance struck by
Congress in our patent laws. Bonito Boats v. Thunder Craft Boats, 489 U.S. 141,
152, 109 S. Ct. 971, 978 (1989). However, the Bonito Boats court expressly excepted
state actions that do not directly interfere with federal patent law. 489 U.S. at 155,
109 S. Ct. at 979-80. The court determined that “state protection of trade secrets . .
. [does] not conflict with the federal patent law,” because it advances “goals outside
the contemplation of the federal patent scheme” in a manner “not aimed exclusively
at the promotion of the invention itself.” 489 U.S. at 166, 109 S. Ct. at 985. “Trade
secret law is intended to prevent ideas from being directly stolen, rather than copied,
and only applies to the small group of people privy to confidential information.” 
Garth v. Staktek Corp., 876 S.W.2d 545, 550 (Tex. App.—Austin 1994, writ dism’d
w.o.j.).
          The Texas Supreme Court has also distinguished trade secret law from patent
law:
If, as has been said in numerous cases, the equitable remedy of
injunction to prevent one person from damaging another through an
abuse of confidence in wrongfully appropriating trade secrets is a
separate remedy and incident to a different right than that secured by a
patent, it would seem that injunctive protection of the trade secret as
against a licensee should not necessarily cease upon the issuance of a
patent.

Hyde Corp. v. Huffines, 314 S.W.2d 763, 773 (Tex. 1958). 
          Relying on the reasoning of Bonita Boats and Hyde, the Austin Court of
Appeals, in Garth v. Staktek Corporation, also found no conflict between federal
patent law and state laws protecting trade secrets that would require dismissal of the
plaintiff’s state law claims. 876 S.W.2d at 550. Likewise, we conclude no conflict
exists between the Strong Plaintiffs’ state law claims and federal patent law. 
          We overrule FSNP’s fourth issue.
B.      Tesco’s Fraud 
          In its first issue, Tesco (1) challenges the legal and factual sufficiency of the
evidence to support the jury’s liability finding on the Strong Plaintiffs’ fraud claim, 
(2) contends the trial court erred in failing to properly instruct the jury on fraud
damages, (3) challenges the legal and factual sufficiency of the evidence to support
the jury’s award of fraud damages, and (4) complains of the punitive damage award.



          1.       Legal and Factual Sufficiency—Standards of Review
          Because Tesco challenges the legal and factual sufficiency of the evidence
related to several of the jury’s liability and damages findings, we begin by setting out
the applicable standards of review for these challenges.
          When the party without the burden of proof challenges the legal sufficiency of
the evidence, we consider all of the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party’s favor. 
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex.
1998); Ned v. E.J. Turner & Co., Inc., 11 S.W.3d 407, 408 (Tex. App.—Houston [1st
Dist.] 2000, pet. denied). If there is more than a scintilla of evidence to support the
finding, we must uphold it. Formosa Plastics Corp. USA v. Presidio Eng’rs, 960
S.W.2d 41, 48 (Tex. 1998). “When the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence, the
evidence is no more than a scintilla and, in legal effect, is no evidence.” Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983); Seideneck v. Cal Bayreuther
Assocs., 451 S.W.2d 752, 755 (Tex. 1970). However, if the evidence supplies some
reasonable basis for differing conclusions by reasonable minds as to the existence of
a vital fact, then there is some evidence. Kindred, 650 S.W.2d at 63.
          By contrast, when the appellant challenges the factual sufficiency of the
evidence on an issue on which it did not have the burden of proof, the appellant must
demonstrate the evidence is insufficient to support the adverse finding. 17090
Parkway, Ltd. v. McDavid, 80 S.W.3d 252, 258 (Tex. App.—Dallas 2002, pet.
denied). In reviewing a factual insufficiency point, we consider, weigh, and examine
all the evidence presented at trial. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442,
445 (Tex. 1989). We set aside a finding for factual insufficiency only if the evidence 
is so “contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.” Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
          2.       Fraud Liability Finding
          When asked whether Tesco committed fraud against the Strong Plaintiffs, the
jury answered “yes.” Regarding this issue, the jury was instructed as follows:
“Fraud” occurs when:
 
a.A party makes a material misrepresentation.
 
b.The misrepresentation is made with knowledge of its falsity or
made recklessly without any knowledge of the truth and as a
positive assertion.
 
c.The misrepresentation is made with the intention that it should be
acted on by the other party, and 
 
d.The other party acts in reliance on the misrepresentation and
thereby suffers injury.
 
“Misrepresentation” means
 
a.A false statement of fact, or
 
b.A promise of future performance made with an intent not to
perform as promised.

          The Strong Plaintiffs’ fraud claim was based, at least in part, on Tesco’s
representation that it would adhere to, and perform in compliance with, the non-competition agreement. As the jury was instructed in this case, the Texas Supreme
Court has held that a fraud cause of action requires “a material misrepresentation,
which was false, and which was either known to be false when made or was asserted
without knowledge of its truth, which was intended to be acted upon, which was
relied upon, and which caused injury.” Formosa Plastics, 960 S.W.2d at 47 (quoting
Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994)). A promise
of future performance constitutes an actionable misrepresentation if the promise was
made with no intention of performing at the time it was made. Formosa, 960 S.W.2d
at 48. However, the mere failure to perform a contract is not evidence of fraud. Id. 
Rather, the Strong Plaintiffs had to present evidence that Tesco represented that it
would comply with the non-compete and non-disclosure provisions with the intent
to deceive and with no intention of performing as represented. See id. 
          While a party’s intent is determined at the time the party made the
representation, it may be inferred from the party’s subsequent acts after the
representation is made. Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex.
1986). Intent is a fact question uniquely within the realm of the trier of fact because
it depends on the credibility of the witnesses and the weight to be given their
testimony. Id. Because intent to defraud is not susceptible to direct proof, it
invariably must be proven by circumstantial evidence. Id. at 435. Slight
circumstantial evidence of fraud, when considered with the breach of a promise to
perform, is sufficient to support a finding of fraudulent intent. Id. 
          Considering the evidence in the light most favorable to the jury’s finding, and
applying the principles enunciated in Formosa and Spoljaric, we review the relevant
evidence. 
          The evidence showed that John Newburn, Tesco’s general manager,
approached Brooks Strong about becoming a Strong Arm dealer in early 1992. 
Brooks insisted that Tesco sign a non-competition agreement. Newburn told Brooks
that Bill Brugger, the owner of Tesco, did not like the non-competition agreement. 
Brooks testified as follows: “The noncompetition he didn’t like. But no particular
part of it. [Brugger] didn’t like the whole thing.” Ultimately, Tesco acquiesced;
Brugger signed the dealership agreement and the accompanying non-competition
agreement on April 6, 1992.
          On appeal, Tesco contends that no evidence exists to establish Tesco’s
fraudulent intent at the time it signed the non-competition agreement. In its brief,
Tesco asserts as follows:
[T]he sparse evidence of pre-contract negotiations was that Tesco did
not want the non-compete provision in the contract, but signed it
anyway. This cannot be any evidence that Tesco intended to breach the
contract from the start. If it were, every party that gives up something
in contract negotiation could be found to have committed fraud.

          In addition to the evidence cited in Tesco’s principal brief as being “no
evidence” of fraud, the Strong Plaintiffs presented the following evidence probative
of Tesco’s intentions when it signed the non-competition agreement:
          •        The term of the dealership agreement between Tesco and Strong
Industries was four years and would automatically continue for two
additional two year terms. The non-competition agreement provided
that Tesco could not compete with Strong Industries for 18 months
“after termination of business with Strong Industries.”
 
          •        On June 29, 1992, less than three months after signing the non-competition agreement with Strong Industries, Tesco entered into a
contract with FSNP relating to the design and development of a trailing
axle, the Maximizer.
 
          •        Tesco had been “involved with” Fred Smith and FSNP for 15 years at
the time the parties signed the contract relating to the development of
the Maximizer. 
 
          •        The June 29 contract indicated that the idea for the Maximizer had been
previously “conceived.”
 
          •        Shortly after Tesco signed the non-competition agreement with Strong
Industries, Newburn began calling Brooks Strong on almost a daily
basis. Newburn was “picking [Brooks’s] brain about how long the bed
should be . . . all the basic parameters for building a super dump.” 
 
          •        Newburn was giving the information he acquired from Brooks to Fred
Smith. The engineer data book for the Maximizer, which Brooks saw
in the summer of 1992, contained faxes from Newburn to Smith. The
faxes contained the information that Brooks had given Newburn
regarding the Strong Arm.
 
          •        Tesco did not purchase its first trailing axle from Strong Industries until
May 1993.
 
          •        When Brooks reminded Newburn that Tesco was subject to a non-competition agreement, Newburn responded, “Those agreements are
only as good as the people who sign them.”
From this evidence the jury could have reasonably inferred that Tesco represented
that it would comply with the provisions of the non-competition agreement with the
intent to deceive and with no intention of performing as represented. After
considering only the evidence and inferences that tend to support the jury’s finding,
disregarding all evidence and inferences to the contrary, we hold that the evidence
was legally sufficient to support the jury’s fraud finding. 
          We next turn to whether the evidence was factually insufficient to show that
Tesco had the requisite intent to defraud the Strong Plaintiffs at the time Tesco signed
the non-competition agreement. Tesco cites to evidence showing that, from 1993
until 1998, it sold 148 Strong Arm trailing axles, generating $2,353,200 in gross
receipts for Strong Industries. Tesco also points to evidence that it assisted Strong
Industries in marketing and promoting the 700 series. Tesco contends that its “efforts
to perform under the agreement’s terms show no fraudulent intent at the time the
agreement was signed.” This may be true, but, as discussed above, other evidence
exists in the record from which a jury could reasonably infer such fraudulent intent. 
In spite of Tesco’s contentions to the contrary, a jury weighed the testimony and
found sufficient evidence of fraud. Examining all the evidence on the issue, we do
not find the evidence supporting the jury’s fraud finding to be so weak or contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust; thus, we
hold it was factually sufficient. 
          3.       Fraud vs. Breach of Contract
          As a corollary to its sufficiency challenge, Tesco also contends that the Strong
Plaintiffs’ fraud claim is the same as their breach of contract claim. 
          The supreme court has “repeatedly recognized that a fraud claim can be based
on a promise made with no intention of performing, irrespective of whether the
promise is later subsumed within a contract.” Formosa, 960 S.W.2d at 46-47. In
Crim Truck & Tractor Company v. Navistar International Transporation
Corporation, the supreme court noted, “As a general rule, the failure to perform the
terms of a contract is a breach of contract, not a tort. However, when one party enters
into a contract with no intention of performing, that misrepresentation may give rise
to an action in fraud.” 823 S.W.2d 591, 597 (Tex. 1992); accord Oliver v. Rogers,
976 S.W.2d 792, 805 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Under
these same principles, the Spoljaric court held that a fraud claim could be maintained,
under the particular facts of that case, for the breach of an oral agreement to pay a
bonus because a “promise to do an act in the future is actionable fraud when made
with the intention, design and purpose of deceiving, and with no intention of
performing the act.” 708 S.W.2d at 434. 
          Here, the Strong Plaintiffs asserted both a breach of contract claim and a fraud
claim against Tesco. The jury made liability findings and awarded damages against
Tesco on both causes of action. The damage award in the judgment was based on the
jury’s award of fraud damages. 
          The Strong Plaintiffs presented evidence at trial relating purely to their breach
of contract claim, i.e., that Tesco breached its duty not to compete with Strong
Industries or to disclose confidential information to third parties gained through the
dealership relationship. However, as discussed above, the Strong Plaintiffs also
presented sufficient evidence for the jury to infer that Tesco entered into the non-competition agreement with “the intention, design and purpose of deceiving,” i.e.,
with the intent to obtain Strong’s proprietary information related to the trailing axle
design, and with no intention of abiding by the non-compete and non-disclosure terms
of the agreement. Such evidence goes beyond showing a mere breach of contract. 
Contrary to Tesco’s contention, we conclude that the Strong Plaintiffs’ fraud claim
was not the same as its breach of contract claim.
          4.       Jury Instruction on Fraud Damages
          Tesco contends that jury question 13 was fatally defective because it did not
contain an instruction on the proper measure of fraud damages. Question 13 read as
follows: “What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate STRONG


 for its damages, if any, proximately caused by
TESCO’s fraud, if any?” The jury answered: “$675,000.00.” No accompanying
instruction was given on the proper legal measure of damages.
          When the trial court fails to include instructions on the proper measure of
damages, it is the complaining party’s burden to object to the charge and to tender
such instructions in substantially correct form. Willis v. Donnelly, 118 S.W.3d 10,
42, (Tex. App.—Houston [14th Dist.] 2003, no pet.); Campbell v. C.D. Payne &
Geldermann Sec., 894 S.W.2d 411, 420 (Tex. App.—Amarillo 1995, writ denied);
Jim Howe Homes, Inc. v. Rogers, 818 S.W.2d 901, 903 (Tex. App.—Austin 1991, no
writ); Nat’l Fire Ins. Co. v. Valero Energy Corp., 777 S.W.2d 501, 508 (Tex.
App.—Corpus Christi 1989, writ denied). The Texas Supreme Court has held that
there is only one test for determining if a party has preserved error in the jury charge,
and that is whether the party made the trial court aware of the complaint, timely and
plainly, and obtained a ruling. State Dep’t of Highways & Pub. Transp. v. Payne, 838
S.W.2d 235, 241 (Tex. 1992); see also Alaniz v. Jones & Neuse, Inc., 907 S.W.2d
450, 451-452 (Tex. 1995) (“[W]hile Payne does not revise the requirements of the
rules of procedure [rule 273] regarding the jury charge, it does mandate that those
requirements be applied in a common sense manner to serve the purposes of the rules,
rather than in a technical manner which defeats them.”). As required by Payne, we
review the record to determine whether Tesco made the trial court aware of its
complaint that question 13 lacked an instruction on the proper measure of fraud
damages and also obtained a ruling.
          On Friday, August 25, 2000, Tesco filed the following written instruction as
a part of a complete charge requested by Tesco:
There are two measures of direct damages for common-law fraud: 1) the
out-of-pocket measure and 2) the benefit-of-the bargain measure. The
out-of-pocket measure computes the difference between the value paid
and the value received, while the benefit-of-the-bargain measure
computes the difference between the value as represented and the value
received.

The trial court did not endorse any of Tesco’s requested jury questions or instructions
as “accepted” or “rejected,” including the above-requested instruction. 
          On Monday, August 28, 2000, the formal jury conference was held before a
visiting judge, the Honorable Katie Kennedy. At the beginning of the charge
conference, Judge Kennedy stated as follows:
Let the record reflect that I’m Judge Katie Kennedy, and I’m sitting in
for Judge Davidson today by assignment. Judge Davidson has been
appointed to hear a disbarment case outside Harris County, and he’s
asked me to sit in to conclude the trial of this matter.
 
. . . .
 
All right. I understand that Judge Davidson had an extensive
informal charge conference with the parties on Saturday, which lasted
some, as I understand it, eight hours or more. So the parties have, as I
understand it, worked with Judge Davidson extensively in an informal
charge conference; and we’re now ready to begin the formal charge
conference.

          Judge Kennedy then asked counsel if each had received sufficient time to
examine the jury charge prepared by the court. Tesco’s counsel responded
affirmatively. The record reflects that on August 28, 2000, the day of the formal
charge conference, Tesco filed its “Requested Jury Questions and Objections” related
to the court’s charge. In this filing, Tesco requested an instruction related to material
breach of contract and objected to jury questions 6, 7, 10, 12, and 13. 
          At the formal charge conference, Judge Kennedy inquired whether Tesco had
any objections to the court’s charge. Consistent with its “Requested Jury Questions
and Objections,” Tesco responded as follows:
[Tesco’s counsel]: Yes, Your Honor. On behalf of Tesco, Tesco has one
request, which is to Question No. 1. In writing we have submitted to the
Court and we ask for an instruction which reads: “A party commits a
material breach of a contract, the non-breaching party is discharged or
excused from any obligation to perform.”
 
And, in addition, we object on the grounds that there’s not a
submission to the jury on Questions No. 6, No. 7, No. 10, No. 12, No.
13. And we object to those questions being submitted to the jury.
 
THE COURT: All right. Objection is overruled and the requested
instruction [to question number one] will be refused. If you want to
hand it up, I’ll mark it “refused” at this time. 

The record reflects that the trial court marked Tesco’s requested instruction to jury
question number one, relating to material breach of a contract, and Tesco’s “no
evidence” objections to jury questions 6, 7, 10, 12, and 13, as “rejected.” 
          On appeal, Tesco asserts that it preserved its complaint regarding the trial
court’s failure to instruct the jury on the proper measure of fraud damages. Tesco
acknowledges that it failed to secure the notation “rejected” or “refused” on its
proposed instruction, but argues that such failure does not automatically result in a
waiver of its complaint. We agree. See Dallas Mkt. Ctr. Dev. Co. v. Liedeker, 958
S.W.2d 382, 386-87 (Tex. 1997) (concluding that trial court’s statement on record
that it would note its refusal on requests preserved error despite trial court’s failure
to endorse and sign requests), overruled in part on other grounds by Torrington Co.
v. Stutzman, 46 S.W.3d 829, 840 (Tex. 2000); Rosell v. Central West Motor Stages,
Inc., 89 S.W.3d 643, 657 (Tex. App.—Dallas 2002, pet. denied) (recognizing
endorsement on proposed charge is not only means of obtaining ruling on requested
jury instruction and holding that party’s offer of instruction and objection to trial
court’s refusal to include instruction preserved error). Rather, to determine whether
Tesco preserved its complaint, we apply the Payne preservation test. That is, we
review the record to determine whether Tesco made the trial court aware of its
complaint, timely and plainly, and secured a ruling. Payne, 838 S.W.2d at 241. 
          Tesco contends that, because it tendered the proposed fraud-damages
instruction to the court, Judge Davidson was made aware of the existence of the
instruction and of Tesco’s complaint that the jury was not instructed on the proper
measure of fraud damages. Tesco also claims that Judge Davidson implicitly denied
the requested instruction by not including it in the court’s charge. We conclude that
the record does not support such inferences. 
          We begin by noting that no record was made of the informal charge conference
with Judge Davidson. We find no indication in the record that Tesco made any
attempt to draw the trial court’s attention to its requested instruction, or its complaint
that the charge failed to instruct the jury on the proper measure of fraud damages. 
The record does not reveal whether Judge Davidson disagreed with Tesco’s proposed
instruction and denied it, as claimed by Tesco, or whether he simply did not notice
the requested instruction on the nineteenth page of a 25-page proposed charge. In any
event, tendering an instruction within an entire proposed charge does not suffice to
preserve error when, as here, the record does not show that the trial court ruled, orally
or in writing, or was otherwise aware of the requested instruction. See Munoz v.
Berne Group, Inc., 919 S.W.2d 470, 472 (Tex. App.—San Antonio 1996, no writ)
(holding appellant failed to preserve error in case in which appellant tendered entire
proposed charge to trial court that included proposed instruction on “safe place to
work,” but made no objection to failure to include such instruction, did nothing to
bring trial court’s attention to instruction, and failed to obtain ruling on tendered
requested instruction).
          Tesco also claims that its objection made at the formal charge conference
preserved its complaint that the trial court failed to instruct the jury on the proper
measure of fraud damages. Specifically, Tesco relies on the following objection:
“[W]e object on the grounds that there’s not a submission to the jury on Questions
No. 6, No. 7, No. 10, No. 12, No. 13. And we object to those questions being
submitted to the jury.” 
          In a post-submission filing with this Court, Tesco stated, 
When Judge Kennedy presented the charge to the parties for formal
objections on the following Monday, Tesco brought the omission [of the
proposed instruction] to Judge Kennedy’s attention by counsel’s
objection that the question lacked a “submission.” No one expressed
any lack of understanding about the objection, and Judge Kennedy
overruled the objection. 

In other words, Tesco contends that the trial court understood Tesco’s reference to
a lack of “submission” to mean a lack of “instruction.” Such a reading is neither plain
nor obvious. Tesco’s objection was made en masse to jury questions 6, 7, 10, 12, and
13.


 If we were to adopt Tesco’s interpretation, then we would also understand the
objection to mean that Tesco was objecting to a lack of instruction for not only
question 13, but also for questions 6, 7, 10, and 12. Such an objection would not
apply to these other questions. In particular, questions 6, 10, and 12 provided
explanatory instructions to the jury. 
          As previously mentioned, Tesco filed separate, but identical, written objections
to questions 6, 7, 10, 12, and 13 on the day of the formal charge conference. Tesco
objected that no evidence supported the submission of questions six, seven, 10, 12,
and 13. In light of these written objections, the more logical interpretation of Tesco’s
verbal objection to questions 6, 7, 10, 12, and 13 at the charge conference would be
that Tesco was objecting to the “submission” of these questions because there was no
evidence to support their submission. 
          In any event, applying the Payne preservation test, we conclude that Tesco’s
objection at the charge conference did not serve to make the trial court aware of its
complaint that question 13 lacked an instruction on the proper measure of fraud
damages. We hold that Tesco failed to preserve error on this point.
          5.       Sufficiency of Evidence—Fraud Damages
          Tesco also attacks the legal and factual sufficiency of the evidence to support
the award of $675,000 in fraud damages to the Strong Plaintiffs. Tesco complains
that the evidence was legally and factually insufficient because the award was
impermissibly based on evidence of Tesco’s gross profits associated with the Maxle
sales.
          In support of its sufficiency of the evidence challenges, Tesco correctly states
that Texas recognizes two measures of direct damages for common-law fraud: the
out-of-pocket measure and the benefit-of-the bargain measure. Formosa Plastics,
960 S.W.2d at 49. The Formosa court concluded that a benefit-of-the-bargain
measure can include lost profits, i.e., profits that would have been made if the bargain
had been performed as promised. Id. at 50. 
          To support their damages claim, the Strong Plaintiffs offered the testimony of
Phillip Levin, a certified public account. Levin testified that Tesco sold 33 Maxles
and Tesco dump beds. According to Levin, Tesco’s “ill-gotten gains” from the sales
of these 33 units ranged from $325,000 to $957,000, depending on whether he
calculated the amount using “gross margin” or “gross contribution” figures.


 
Although not expressly stated, it appears that this damages model was offered to
support the Strong Plaintiffs’ breach of contract claim. The non-competition
agreement between Strong Industries and Tesco contained a liquidated damages
provision that stated if Tesco breached either the non-compete or confidentiality
provisions of the agreement, Strong Industries would be entitled to “repayment of all
profits, compensation, commissions, remunerations, or benefits which [Tesco]
directly or indirectly has realized . . . .” 
          Tesco points out that the Strong Plaintiffs offered no evidence of lost “net
profits.” Tesco complains that evidence of Tesco’s “gross profits” for the Maxle
sales was legally and factually insufficient to support the jury’s award of fraud
damages because the correct legal measure of damages for lost profits is net profits,
not gross profits. As a general proposition, this is true. See Holt Atherton v. Heine,
835 S.W.2d 80, 87 n.1 (Tex. 1992) (stating correct measure of lost profits is net
profits, not gross profits); see also Turner v. PV Int’l Corp., 765 S.W.2d 455, 465
(Tex. App.—Dallas 1988), writ denied per curiam, 778 S.W.2d 865 (Tex. 1989)
(same); but see Stuart v. Bayless, 945 S.W.2d 131, 140-41 (Tex. App.—Houston [1st
Dist.] 1996), rev’d on other grounds, 964 S.W.2d 920 (Tex. 1998) (recognizing that
if defendant’s breach of contract or fraud reduces volume of plaintiff’s business, but
creates no reasonable opportunity for plaintiff to reduce its general overhead
expenses, then appropriate measure of damages is amount of lost revenue, without
deduction for portion of the fixed overhead expenses); Houston Chronicle Publ’g Co.
v. McNair Trucklease, Inc., 519 S.W.2d 924, 932 (Tex. Civ. App.—Houston [1st
Dist.] 1975, writ ref’d n.r.e.) (same). 
          In support of its sufficiency challenges, Tesco complains that, as a result of the
trial court’s failure to instruct the jury on the proper measure of fraud damages, the
trial court awarded damages that were not legally recoverable for fraud, i.e., “gross
profits.” Tesco contends that its sufficiency challenges on this basis were preserved
by its post-verdict motions.


 We disagree. 
          Because the crux of its sufficiency complaint is premised on charge error,
Tesco was required to preserve error by objecting to the lack of a damages instruction
before submission to the jury when the trial court could have cured any error. See
Holland v. Wal-mart Stores, 1 S.W.3d 91, 94 (Tex. 1999) (stating that if trial court
has “to resolve a legal issue before the jury could properly perform its fact-finding
role[,] . . . a party must lodge an objection in time for the trial court to make an
appropriate ruling without having to order a new trial.”). A party who delays
objecting to the lack of a damages instruction until after submission to the jury has
waived its complaint because, at that point, the trial court cannot redress the error by
adding an instruction. See Allen v. Am. Nat’l Ins. Co., 380 S.W.2d 604, 607-09 (Tex.
1964).
          Because Tesco failed to object to the lack of a jury instruction on the proper
measure of damages, we conclude that Tesco waived its complaint that the trial court
awarded fraud damages based on a legally-incorrect measure of damages. See
Haskett v. Butts, 83 S.W.3d 213, 220 (Tex. App.—Waco 2002, pet. denied) (holding
defendant waived complaint that evidence was legally and factually insufficient to
show which of plaintiff’s medical expenses may have been associated only with
claims in the lawsuit because defendant did not object or request instruction requiring
jury to segregate damages); Columbia/HCA Healthcare Corp. v. Cottey, 72 S.W.3d
735, 747 (Tex. App.—Waco 2002, no pet.) (determining that, because there was no
objection to charge as submitted, defendants could not complain on appeal that jury
awarded damages which would not otherwise be recoverable for fraudulent
inducement); Tribble & Stephens Co. v. Consol. Servs., Inc., 744 S.W.2d 945, 949
(Tex. App.—San Antonio 1987, writ denied) (holding that defendant had waived
right to complain on appeal that plaintiff had offered insufficient evidence of proper
measure of damages because defendant had failed to point out to trial court that
improper measure of damages was submitted to jury); Vaughn Bldg. Corp. v. Austin
Co., 620 S.W.2d 678, 683 (Tex. App.—Dallas 1981), aff’d, 643 S.W.2d 113 (1983)
(concluding sufficiency of the evidence challenge based on contention that erroneous
measure of damages was submitted to jury was waived by defendant’s failure to
object on that basis in trial court); American Transfer & Storage Co. v. Reichley, 560
S.W.2d 196, 199-200 (Tex. Civ. App.—Amarillo 1977, writ ref’d n.r.e.) (“Unless a
party objects to the charge on the ground that it submits an improper measure of
damages, he waives the objection and cannot complain on appeal that the charge
permitted the jury to find damages based on the wrong measure.”).
          To the extent that Tesco’s complaint can be construed generally to say that no
evidence was presented to support the jury’s finding of fraud damages in the amount
of $675,000, we are required to review the sufficiency of the evidence based upon the
charge submitted, even if erroneous, not the charge which should have been
submitted. See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). It is undisputed
that the jury’s award of $675,000 in fraud damages was within the range of
unobjected to damages evidence presented at trial by the Strong Plaintiffs. 
Accordingly, applying the appropriate standard of review, we hold the evidence was
legally sufficient to support the award of fraud damages.


 See Stamp-Ad, Inc. v.
Barton Raben, Inc., 915 S.W.2d 932,936-37 (Tex. App.—Houston [1st Dist.] 1996,
no writ) (holding evidence was legally and factually sufficient to support award of
gross profits for breach of contract even though plaintiff did not present evidence of
net profits in case in which jury was not instructed on proper measure of damages).
          Tesco also contends that the Strong Plaintiffs’ evidence of gross profits was
insufficient because Tesco offered controverting evidence showing that its profits
were actually lower than the range provided by Levin. We construe this contention
to be offered in support of Tesco’s factual sufficiency challenge to the award of fraud
damages. Tesco’s damages expert opined that Levin failed to analyze all of the data
and information necessary to render an opinion on Tesco’s profits. Tesco also
presented evidence that the percentage of its profit margin was lower than that
utilized by Levin in calculating the range of Tesco’s profits from the Maxle sales. 
The jury obviously chose to believe Levin. We cannot substitute our conclusions for
those of the jury, and it is not within the province of this Court to interfere with the
jury’s resolution of conflicts in the evidence or to pass on the weight or credibility of
the witnesses’ testimony. Leyva v. Pacheco, 358 S.W.2d 547, 549 (Tex. 1962);
Eberle v. Adams, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st Dist.] 2001, pet.
denied). Applying the appropriate standards of review, we further hold that the
evidence was factually sufficient to support the jury’s award of damages under the
charge as given. 
          6.       Punitive Damages
          Tesco also challenges the legal and factual sufficiency of the evidence to
support the jury’s punitive damage award. Tesco correctly points out that the
punitive damage award was predicated on the jury’s fraud finding. Tesco contends
that, because the Strong Plaintiffs were not entitled to a liability finding on fraud, or
to fraud damages, they were also not entitled to punitive damages. See Tex. Builders
v. Keller, 928 S.W.2d 479, 482 (Tex. 1996) (recognizing punitive damages may not
be awarded unless actual damages are found). Because we have held that the
evidence was legally and factually sufficient to support such findings as discussed
above, Tesco’s challenge to the punitive damages award also fails.
          For all of the foregoing reasons, we overrule Tesco’s first issue.
C.      Tesco’s Remaining Issues
          In its second and third issues, Tesco contends that insufficient evidence was
presented to support the jury’s findings of breach of contract and misappropriation
of trade secrets. As previously mentioned, the Strong Plaintiffs elected to recover
actual and punitive damages on their fraud cause of action. Accordingly, the trial
court’s judgment did not award the Strong Plaintiffs actual damages for either breach
of contract or misappropriation of trade secrets. We have held that the evidence was
legally and factually sufficient to support the trial court’s award of damages under the
Strong Plaintiffs’ fraud theory. Tesco presented no appellate argument in its principal
briefing that the injunctive relief awarded against Tesco could not be based on the
Strong Plaintiffs’ fraud claim. Moreover, to the extent that the trial court’s judgment
recites that it awarded attorney’s fees against Tesco as a result of the jury’s breach of
contract finding, Tesco has made no appellate challenge to the trial court’s award of
attorney’s fees; thus, any complaint regarding the attorney’s fees award has been
waived by Tesco. For these reasons, we need not address Tesco’s second and third
issues. We discuss Tesco’s fourth issue together with FSNP’s fifth issue, which both
complain of the permanent injunction awarded by the trial court. 
D.      FSNP’s Breach of Contract
          In its first issue, FSNP complains of the $65,000 breach of contract damage
award rendered against it on several grounds. One of these grounds is that, by
awarding the Strong Plaintiffs fraud damages against Tesco and breach of contract
damages against FSNP, the trial court gave the Strong Plaintiffs an impermissible
“double recovery” of damages.


 We agree.
          A party is entitled to sue and seek damages on alternative theories but is not
entitled to recover on both theories; to do so is considered equivalent to a “double
recovery.” Waite Hill Servs., Inc. v. World Class Metal Works, Inc., 959 S.W.2d 182,
184 (Tex. 1998); Birchfield v. Texarkana Mem’l Hosp., 747 S.W.2d 361, 367 (Tex.
1987); Foley v. Parlier, 68 S.W.3d 870, 882-83 (Tex. App.—Fort Worth 2002, no
pet.). In this context, a double recovery exists when a plaintiff obtains more than one
recovery for the same injury. Waite Hill, 959 S.W.2d at 184; Foley, 68 S.W.3d at
882-83. The prohibition against double recovery is a corollary of the rule that a party
is entitled to but one satisfaction for the injuries sustained by him. See Stewart Title
Guar. Co. v. Sterling, 822 S.W.2d 1, 7-8 (Tex. 1991) (noting that courts have applied
one satisfaction rule when defendants commit same act as well as when defendants
commit technically differing acts that result in single injury). 
          Here, although Tesco and FSNP may have committed technically different acts,
the Strong Plaintiffs incurred only a single financial injury—lost sales of the 700
series. At trial, the Strong Plaintiffs offered the following damages models: (1)
Tesco’s profits or “ill-gotten gains” from the sale of 33 Maxles; (2) the Strong
Plaintiffs’ lost profits resulting from the sale of 45 Maxles by Tesco and Silent Drive;
and (3) the Strong Plaintiffs’ investment and advertising costs.


 Regardless of which
of these theories the jury applied in awarding damages against Tesco and FSNP, the
damages awarded were to compensate the Strong Plaintiffs for the same loss.
          At oral argument, the Strong Plaintiffs contended that awarding fraud damages
against Tesco and breach of contract damages against FSNP was not a double
recovery of damages. The Strong Plaintiffs argued that, when those two damage
awards are added together, the total award is still within the range of evidence
presented at trial. The Strong Plaintiffs have not cited, and we have not found, any
authority to support such an exception to the prohibition against double recovery of
damages. To the contrary, a party is entitled to only one remedy if that remedy makes
it whole. JHC Ventures, L.P. v. Fast Trucking, Inc. 94 S.W.3d 762, 775 (Tex.
App.—San Antonio 2002, no pet.); Hendon v. Glover, 761 S.W.2d 120, 122 (Tex.
App.—Beaumont 1988, writ denied). Here, the award of fraud damages against
Tesco made the Strong Plaintiffs whole. Thus, allowing the Strong Plaintiffs to
recover an additional sum for contract damages against FSNP constituted a prohibited
double recovery. We hold that the trial court erred in awarding the Strong Plaintiffs
both fraud damages against Tesco and breach of contract damages against FSNP. 
Accordingly, we sustain FSNP’s first issue on this basis and need not address the
remaining grounds brought under this issue. 
E.      FSNP’s Misappropriation of Trade Secrets
          In its third issue, FSNP attacks the jury’s liability and damages findings against
it on the Strong Plaintiffs’ misappropriation of trade secrets claim. Although the
Strong Plaintiffs elected to have judgment against FSNP on their breach of contract
damages, we review FSNP’s third issue because, in cases in which the jury returns a
verdict on two or more alternative theories, as in this case, the prevailing party may
recover under an alternative theory if judgment on one theory is reversed on appeal. 
See Transport Ins. Co. v. Faircloth, 898 S.W.2d 269, 274 (Tex. 1995). 
          As it did in its first issue with regard to the award of breach of contract
damages, FSNP contends that, to award the Strong Plaintiffs fraud damages against
Tesco and misappropriation of trade secret damages against FSNP, would result in
an impermissible double recovery of damages for the Strong Plaintiffs. We agree. 
For the same reasons stated in our discussion of FSNP’s first issue, we hold that
awarding the Strong Plaintiffs damages against FSNP for misappropriation of trade
secrets and against Tesco for fraud would also be an impermissible double recovery
of damages. Accordingly, we sustain FSNP’s third issue on this basis and need not
address the remaining grounds brought under this issue. 
F.      Attorney’s Fees Against FSNP
          In its second issue, FSNP complains that the trial court erred in awarding
attorney’s fees against it because the Strong Plaintiffs failed to make a “presentment”
of their claim under section 38.002(2) of the Civil Practice and Remedies Code. Tex.
Civ. Prac. & Rem. Code Ann. § 38.002 (Vernon 1997).  Section 38.001(8) of the
Civil Practice and Remedies Code provides that a party may recover reasonable
attorney’s fees if the claim is for an oral or written contract. Id. § 38.001(8) (Vernon
1997). To recover attorney’s fees under section 38.001, the prevailing party must
have presented the claim to the opposing party and must show that payment was not
made within 30 days of the claim’s presentment. Id. § 38.002(2), (3) (Vernon 1997). 
The purpose of presentment is to allow the opposing party to pay a claim within 30
days, before becoming liable for attorney’s fees. Jones v. Kelly, 614 S.W.2d 95, 100
(Tex. 1981). 
          Here, the Strong Plaintiffs do not deny that they made no presentment to FSNP;
rather, they contend that the jury’s finding of liability for misappropriation of trade
secrets allows recovery of attorney’s fees without presentment. Regardless of
whether the Strong Plaintiffs are correct, the trial court’s judgment recites, “The Court
further finds that STRONG is entitled to attorney’s fees against both Tesco and FSNP
as a result of the jury’s findings that both TESCO and FSNP breached their contracts
with Strong.” Moreover, based on the Strong Plaintiffs’ election of remedies, the trial
court awarded damages to the Strong Plaintiffs based on breach of contract, not
misappropriation of trade secrets. Thus, the Strong Plaintiffs were required to show
presentment of their claim to be entitled to attorney’s fees. Because no presentment
was made, the award of attorney’s fees against FSNP cannot stand. We hold the trial
court erred in awarding $45,000 in attorney’s fees against FSNP.
          We sustain FSNP’s second issue.
G.      Injunctive Relief Against FSNP and Tesco
          In Tesco’s fourth issue and FSNP’s fifth issue, Tesco and FSNP complain of
the permanent injunctive relief awarded by the trial court. 
          With regard to the injunctive relief, the trial court’s judgment provides as
follows:
By agreement of the parties, the Court reserved determination of
Plaintiffs’ claims for injunctive relief, for a turnover order, and for
reasonable and necessary attorney’s fees. The Court submitted
questions, definitions, and instructions to the jury on the remaining
matters that were tried.
 
. . . .
 
The Court further orders [Tesco] and [FSNP], and their officers,
agents, servants and employees, and everyone in active concert or
participation with either of them, including but not limited to [Silent
Drive] . . . of Orange City, Iowa, who shall receive actual notice of this
Order by personal service, or otherwise, are perpetually enjoined and
restrained from designing, manufacturing, testing, selling, offering to
sell, distributing, installing, repairing or altering (1) any trailing axle
assembly whose design is based upon or derived from, in whole or in
part, the Trade Secret Information of STRONG, including but not
limited to the “MAXLE” trailing axle; (2) any accessories for dump
trucks compatible with such trailing axle assemblies or whose design is
based upon or derived from, in whole or in part, the Trade Secret
Information of STRONG. . . . The Clerk is directed to issue a Writ of
Injunction consistent with this Order.
 
The Court further orders that all rights, title, interest,
ownership, and possession of all prototypes of, in and/or pertaining
to the MAXLE TRAILING AXLE, which are owned, possessed,
held or otherwise controlled by [Tesco] and [FSNP] be and are
hereby assigned, granted and conveyed to BROOKS STRONG . . . . 
(Bolded emphasis in original; footnote omitted.) 
          FSNP first complains that the parties did not agree that the trial court could
determine the permanent injunction and turnover order issues. FSNP acknowledges 
that the trial court’s judgment recites that the parties had such an agreement. Recitals
contained in a judgment are presumed to be true; such presumption is rebuttable when
a conflict exists between the judgment and the record. See Alcantar v. Okla. Nat.
Bank, 47 S.W.3d 815, 823 (Tex. App.—Fort Worth 2001, no pet.); MJR Fin., Inc. v.
Marshall, 840 S.W.2d 5, 9 (Tex. App.—Dallas 1992, orig. proceeding). Here, FSNP
points to no such conflict in the record; thus, we presume that the trial court’s
recitation in the judgment—that the parties agreed to have the trial court determine
the injunctive relief issues—is true.
          FSNP also contends that the “injunctive relief sought [sic]” exceeded the scope
of the relief requested in the Strong Plaintiffs’ fifth amended petition, the live
pleading at the time of trial. The petition stated that the Strong Plaintiffs sought a
permanent injunction against Tesco, FSNP, “and all others in connection or concert
with either of them.” The petition stated as follows:
Defendants and others in concert with them should be enjoined from
participating in the manufacture, sale, and/or distribution of the MAXLE
trailing axle, or any product based upon, utilizing or containing any
confidential design information of STRONG, or derived therefrom, in
whole or in part. There is no other adequate remedy at law for
continued violations of the duties set forth herein.
          “A petition is sufficient if it gives fair and adequate notice of the facts upon
which the pleader bases his claim. The purpose of this rule is to give the opposing
party information sufficient to enable him to prepare a defense.” Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 897 (Tex. 2000) (citing Roark v. Allen, 633
S.W.2d 804, 810 (Tex. 1982)); see also Tex. R. Civ. P. 47 (providing that pleading
setting forth claim for relief must contain short statement of cause of action sufficient
to give fair notice of claim involved, statement that damages sought are within
jurisdictional limits of court, and demand for judgment). Applying the “fair and
adequate notice” standard, we conclude the relief requested in the Strong Plaintiffs’
live pleading sufficiently encompassed the injunctive relief awarded by the trial court.
          In one sentence, and without supporting argument, FSNP asserts the following
in its brief: “[T]he injunctive relief sought was overbroad as not all parties needed for
just adjudication were present because Silent Drive was not a party to this lawsuit,
and vague and ambiguous as FSNP cannot determine precisely its obligations under
the injunction.” Without further argument or any citation to the record, FSNP has
presented nothing for this Court to review on these grounds. Wheeler v. Methodist
Hosp., 95 S.W.3d 628, 646 (Tex. App.—Houston [1st Dist.] 2002, no pet.); see also
Tex. R. App. P. 38.1(h) (stating appellate brief must contain clear and concise
argument for contentions made, with appropriate citations to authorities and record).
          We next discuss, and reject, Tesco’s and FSNP’s contention that the injunctive
relief awarded by the trial court was unnecessary because the Strong Plaintiffs have
sufficient protection under federal patent law based on the patent issued on the 700
series. What Tesco and FSNP fail to recognize is that the Strong Plaintiffs sought
injunctive relief not only to protect their property rights with respect to the 700 series,
but also to protect the design knowledge that the Strong Plaintiffs gained through
many years of trial and error in designing the entire Strong Arm series. 
          The trial court granted a permanent injunction to protect far more than the
Strong Plaintiffs’ design rights related to the 700 series. The injunction perpetually
enjoins and restrains Tesco and FSNP from “designing, manufacturing, testing,
selling, offering to sell, distributing, installing, repairing or altering (1) any trailing
axle assembly whose design is based upon or derived from, in whole or in part, the
Trade Secret Information of STRONG . . . .” The judgment defines “Trade Secret
Information” to 
mean and include the design criteria developed by STRONG for
designing and manufacturing trailing axle assemblies, the design criteria
developed by STRONG for designing and fabricating accessories for
dump trucks compatible with such trailing axle assemblies and the
design criteria developed by STRONG for optimizing combinations of
such trailing axle assemblies and compatible dump trucks.
          Because the 700 series patent serves to protect only the Strong Plaintiffs’
design rights related to the 700 series, utilizing federal patent law to enforce the
property rights protected by the patent would not protect the Strong Plaintiffs’
property rights related to their “Trade Secret Information.” In other words, the Strong
Plaintiffs cannot employ federal patent law to protect all of the property rights
encompassed within the trial court’s definition of “Trade Secret Information.” Thus,
a permanent injunction was necessary to protect those rights.
          Citing Manning v. Wieser, Tesco and FSNP also contend that the trial court
abused its discretion


 in awarding permanent injunctive relief because the Strong
Plaintiffs failed to show a “probable right to permanent relief and probable injury.”
474 S.W.2d 448, 449 (Tex. 1971). However, Manning involved a challenge to a
temporary injunction, not a permanent injunction. To be entitled to a temporary
injunction, an applicant must plead a cause of action, show a probable right to recover
on that cause of action, and show a probable injury in the interim. Sun Oil Co. v.
Whitaker, 424 S.W.2d 216, 218 (Tex. 1968); T-N-T Motorsports, Inc. v. Hennessey
Motorsports, Inc., 965 S.W.2d 18, 23 (Tex. App.—Houston [1st Dist.] 1998, pet.
dism’d). In comparison, to be entitled to a permanent injunction, as here, a litigant
must plead and prove (1) a wrongful act; (2) imminent harm; (3) irreparable injury;
and (4) no adequate remedy at law. Jordan v. Landry’s Seafood Rest., Inc., 89
S.W.3d 737, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); see also Morris
v. Collins, 881 S.W.2d 138, 140 (Tex. App.—Houston [1st Dist.] 1994, writ denied). 
The Strong Plaintiffs sought a permanent, not a temporary injunction. Therefore, the
Strong Plaintiffs were not required to show a “probable right to permanent relief and
probable injury”; Tesco’s and FSNP’s challenge to the permanent injunctive relief
ordered by the trial court fails on this ground. 
          Lastly, Tesco provides this Court with two sentences of conclusory argument
that the Strong Plaintiffs have an adequate remedy at law: an award of lost profits. 
In support of this point, Tesco provides no citation to the appellate record and
provides no analysis demonstrating that the Strong Plaintiffs have an adequate
remedy at law. Because Tesco’s argument is wholly conclusory and provides no
substantive analysis or discussion to support its contention, we conclude Tesco has
failed to present this argument for appellate review. See Wheeler, 95 S.W.3d at 646;
Tex. R. App. P. 38.1(h). 
          In similar fashion, FSNP contends that by bringing a claim for future damages,
and by being awarded such damages, the Strong Plaintiffs failed to show that the
injury they suffered was irreparable and that no adequate remedy existed at law. 
FSNP further contends that an award of future damages and injunctive relief is an
impermissible double recovery. However, FSNP fails to show this Court where in the
record the Strong Plaintiffs were awarded future damages and also fails to adequately
develop its appellate argument on this point. As a result, FSNP has failed to preserve
this contention for our review. See Wheeler, 95 S.W.3d at 646; Tex. R. App. P.
38.1(h).
          We overrule Tesco’s fourth issue and FSNP’s fifth issue. 
CONCLUSION
          In accordance with this opinion, we affirm the portion of the trial court’s
judgment awarding actual and punitive damages against Tesco. We also affirm that
portion of the judgment setting forth the injunctive relief ordered by the trial court. 
As to FSNP, we reverse and render a take-nothing judgment.



 
                                                             Laura C. Higley 
                                                             Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Higley.