Opinion issued September 23, 2004
                            











In The
Court of Appeals
For The 
First District of Texas




NO. 01-02-00065-CV




WILLIAM H. ELLIOTT JR., Appellant




V.

STEPHEN WHITTEN, Appellee




On Appeal from the 334th District Court
 Harris County, Texas
Trial Court Cause No. 97-57977




* * *




NO. 01-02-00065-CV




STEPHEN WHITTEN, Appellant

V.

 WILLIAM H. ELLIOTT JR., Appellee




On Appeal from the 334th District Court
 Harris County, Texas
Trial Court Cause No. 97-57977




MEMORANDUM OPINION
          William H. Elliott Jr. appeals from a judgment, rendered upon a jury verdict,
awarding Stephen Whitten $350,000 in actual damages on Whitten’s claim for
fraudulent inducement of contract. Whitten, in turn, appeals the granting of Elliott’s
motion for judgment not withstanding the verdict (“JNOV”) on the jury’s award of
exemplary damages. We determine (1) whether Whitten’s fraudulent-inducement
claim was precluded as a matter of law because the oral agreement upon which it was
based was allegedly unenforceable under the statute of frauds and (2) whether legally
and factually sufficient evidence supported the jury’s liability and damages answers. 
We affirm the judgment in part, reverse it in part, and remand the cause.
 
Background
          Elliott was the founder of I-Star, a closely held corporation that provided,
among other things, security services to commercial clients. Elliott approached
Lanax, a company with which Whitten had been consulting, to develop an interactive
security system for I-Star. Lanax contracted with I-Star to manufacture the
equipment, to build the system, and to teach I-Star how to install and to operate the
system.
          Lanax encountered difficulties in implementing the system. Although the
Lanax contract eventually fell through, I-Star continued working with Whitten on a
consulting basis. Whitten and I-Star initially agreed orally that Whitten would
receive $1,000 per week for his consulting services, which agreement, according to
Whitten, was to last only two weeks. Whitten asserted that, in October 1994, the
parties orally agreed that Whitten would continue working for $1,000 per week, plus
25% of I-Star’s stock. Elliott denied that such an oral agreement for stock existed. 
The October 1994 oral agreement was the alleged contract upon which Whitten
would later base his first fraudulent-inducement claim (“the first fraud”).
          Sometime in December 1994, Whitten became an I-Star employee, although 
his compensation did not change. Whitten asserted that, in June 1996, when I-Star
was in particular need of outside capital, he offered to give up his 25% equity interest
in I-Star in exchange for becoming I-Star’s exclusive hardware supplier. Whitten
testified that Elliott verbally accepted this offer. Elliott denied at trial that the June
1996 agreement existed. This June 1996 oral agreement was the event upon which
Whitten would later base his second fraudulent-inducement claim (“the second
fraud”). 
          The parties’ relationship fell apart after the second fraud, and Whitten resigned
in November 1997. He asserted that Elliott had made several oral promises to
compensate him for certain contract services after he resigned, but that I-Star did not
fulfill those promises. Elliott denied having made certain of these promises and
claimed that Whitten had voluntarily modified others of them.
          In November 1997, I-Star sued Whitten in trial court cause number 97-57977,
based on a “Consulting and Severance Agreement” (“the C&S agreement”) between
Whitten and I-Star,


 seeking attorney’s fees and a declaration of the following
matters: a declaration of the parties’ rights under the C&S agreement; a declaration
that I-Star had no obligation under the C&S agreement to give Whitten an interest in
I-Star; and a declaration that the C&S agreement called for arbitration of any claims
that Whitten might have. Whitten’s answer asserted that the C&S agreement was
invalid and alleged the defense of forgery. In April 1998, Whitten counterclaimed
against I-Star, alleging that the C&S agreement was invalid, asserting claims for
breach of contract, quantum meruit, and fraudulent inducement,


 and seeking actual
and exemplary damages and attorney’s fees. Whitten simultaneously moved to join
Elliott as a third-party defendant to Whitten’s counterclaims.
          In July 1998, despite having moved to bring in Elliott as a third-party defendant
in I-Star’s suit against Whitten, Whitten filed his own lawsuit against Elliott
individually and as “acting on behalf of [I-Star]” in another court under trial court
cause number 98-317-98. Whitten alleged claims for fraud and sought actual and
exemplary damages and attorney’s fees. Elliott answered, asserting as affirmative
defenses the C&S agreement and arbitration, and advised the court that another suit
involving the same transactions had already been filed. Both causes were eventually
consolidated under the first suit’s cause number. 
 
          The consolidated cause went to trial before a jury in April 2001. The jury
found that the parties had not agreed to the C&S agreement; found that Elliott had
committed fraud in connection with the promise to give Whitten 25% of I-Star’s stock
(the first fraud); awarded Whitten $375,000 in actual damages for the first fraud;
found that Elliott had also committed fraud by inducing Whitten to give up the 25%
equity interest in I-Star (the second fraud); awarded Whitten $125,000 in actual
damages for the second fraud; found that Elliott was acting on I-Star’s behalf when
he committed both frauds; and awarded Whitten $1 million against I-Star and
$250,000 against Elliott as exemplary damages. To avoid a double recovery, Whitten
elected to recover for the first fraud only. Upon Whitten’s motion for judgment and
his later motion to modify the judgment, and upon Elliott and I-Star’s motions for
JNOV, for new trial, and, alternatively, for remittitur, the trial court signed an
amended final judgment that rendered a take-nothing judgment on Whitten’s claims
against I-Star; that rendered judgment against Elliott individually for $375,000 in
actual damages, for pre- and post-judgment interest, and for court costs; that awarded
no exemplary damages to Whitten; that denied I-Star’s request for declaratory relief;
and that denied any party’s attorney’s fees.


 Both parties appeal.
Elliott’s Appeal
A.      Viability of Whitten’s Fraudulent-Inducement Cause of Action
          In issue one, Elliott argues that the trial court erred by not directing a verdict
on Whitten’s fraudulent-inducement claim for the first fraud, and, alternatively, by
not disregarding the jury’s verdict on that claim, because the claim was based on an
oral promise to transfer stock that was allegedly unenforceable under the statute of
frauds.



          1.       Standard of Review
          “A court may instruct a verdict if no evidence of probative force raises a fact
issue on the material questions in the suit.” Prudential Ins. Co. of Am. v. Fin’l Rev.
Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). A directed verdict for a defendant may
be proper when a plaintiff fails to present evidence raising a fact issue essential to its
right of recovery or if the plaintiff admits or the evidence conclusively establishes a
defense to the plaintiff’s cause of action. Id. JNOV is proper when a directed verdict
would have been proper, i.e., when no evidence supports the jury finding, when a fact
necessary to the finding is conclusively established to the contrary, or when a legal
principle precludes recovery. See Tex. R. Civ. P. 301; Salinas v. Rafati, 948 S.W.2d
286, 289 (Tex. 1997); John Masek Corp. v. Davis, 848 S.W.2d 170, 173-74 (Tex.
App.—Houston [1st Dist.] 1993, writ denied).
          Elliott’s challenges generally involve questions of law, which we review de
novo. See In re Humphreys, 880 S.W.2d 402, 404 (Tex. 1994) (“[Q]uestions of law
are always reviewable de novo.”). To the extent that Elliott’s challenges concern
disputed fact issues, we consider only the evidence that is in the light most favorable
to the jury’s verdict, taking all reasonable inferences in the verdict’s favor. See
Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994) (directed verdict);
Navarette v. Temple Indep. Sch. Dist., 706 S.W.2d 308, 309 (Tex. 1986) (JNOV).
          2.       Haase v. Glazner
          Elliott’s issue one is premised on Haase v. Glazner, 62 S.W.3d 795, 798 (Tex.
2001).


 To the extent that a claimant seeks to recover the benefit of the bargain made
in a non-existent, invalid, or unenforceable contract, the claimant may not recover
under a theory of fraudulent inducement. Id. at 796, 798-99. This result ensues
because proof that a party relied to its detriment on an alleged misrepresentation is
an essential element of a fraud claim, and one cannot detrimentally rely on an invalid
or non-existent agreement. Id. at 798. Additionally, fraudulent inducement requires
proof of the contract’s existence. Id. at 798-99. Therefore, with regard to a contract
that the statute of frauds makes unenforceable, the statute’s purpose would be
frustrated by allowing recovery of benefit-of-the-bargain damages under a fraudulent-inducement theory. Id. at 799. 
          Haase applies only if the underlying contract is invalid or unenforceable. See
id. at 798-99. Elliott’s sole argument below was that, because Whitten admitted that
no writing signed by I-Star or Elliott reflected the oral agreement underlying the first
fraud, the statute of frauds made that oral agreement unenforceable.


 Whether a
contract falls within the statute of frauds is a question of law. Bracher v. Dozier, 346
S.W.2d 795, 796 (Tex. 1961). The statute of frauds is an affirmative defense. See
Tex. R. Civ. P. 94. 
 
          Elliott relies on two statutes in support of his statute-of-frauds argument. First,
Elliott argues that former Business and Commerce Code section 8.319 makes the oral
contract underlying the first fraud unenforceable. See Act of May 25, 1967, 60th
Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2512, repealed by Act of May
27, 1995, 74th Leg., R.S., ch. 962, § 1, 1995 Tex. Gen. Laws 4760, 4767 (appearing
at Tex. Bus. & Com. Code Ann. § 8.113 (Vernon 2002)) [hereinafter “former section
8.319”]. Second, Elliott argues that Business and Commerce Code section 26.01
makes the oral contract unenforceable because the agreement was allegedly
unperformable within a year. See Tex. Bus. & Com. Code Ann. § 26.01 (Vernon
2002).
                    a.       Business and Commerce Code Section 8.319
          Concerning Elliott’s challenge based on former Business and Commerce Code
section 8.319, we note that former section 8.319 provided, in pertinent part:
A contract for the sale of securities is not enforceable by way of
action or defense unless
 
(1)there is some writing signed by the party against whom
enforcement is sought or by his authorized agent or broker sufficient to
indicate that a contract has been made for sale of a stated quantity of
described securities at a defined or stated price; . . . .

Former section 8.319, Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex.
Gen. Laws 2343, 2512 (emphasis added).
          We disagree with Elliott’s challenge under former Business and Commerce
Code section 8.319 for two reasons. First, the oral agreement underlying the first
fraud was not a “sale of securities” to which former section 8.319 could apply. 
Whitten testified that, before Elliott’s oral promise to give him I-Star stock, Whitten
had agreed to consult with I-Star for $1,000 per week for two weeks. At the end of
that time, Whitten testified that he could no longer work for that sum and that he
instead proposed working for I-Star as an exclusive manufacturer, plus $2,500 per
week. Whitten testified that, when that proposal fell through, he then proposed
continuing to work for I-Star for $1,000 per week, plus a 25% equity interest in I-Star. Therefore, the contract underlying the first fraud was one of continued
employment. “[T]he statute of frauds [under former section 8.319] does not apply to
all agreements involving stock or securities,” but instead applies only to agreements
for the sale of securities. Williams v. Gaines, 943 S.W.2d 185, 190 (Tex.
App.—Amarillo 1997, writ denied); see also Former section 8.319, Act of May 25,
1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2512. The Uniform
Commercial Code, under which former section 8.319 also fell, defines a “sale” as the
“passing of title from the seller to the buyer for a price.” Tex. Bus. & Com. Code
Ann. § 2.106(a) (Vernon 1994). An employment agreement in which the one
employed is to receive stock does not fit this definition of “sale” and is thus not an
agreement for the sale of securities under former section 8.319. See Bowers Steel,
Inc. v. DeBrooke, 557 S.W.2d 369, 373-74 (Tex. Civ. App.—San Antonio 1977, no
writ) (holding that former section 8.319 does not prohibit enforcement of oral
employment contract for which consideration is corporate stock).


 Accordingly,
former section 8.319 could not apply to the oral agreement underlying the first fraud.



          Second, even if the oral agreement constituting the first fraud were for a sale
of securities, former section 8.319 would still not apply. Elliott claimed that, because
the agreement to give Whitten 25% of I-Star’s stock occurred in 1994, former section
8.319 applied. We disagree. In repealing former section 8.319, the Legislature
provided, “This [supplanting] Act does not affect an action or proceeding commenced
before this Act takes effect.” Act of May 27, 1995, 74th Leg., R.S., ch. 962, § 21,
1995 Tex. Gen. Laws 4760, 4787. The triggering date for the 1995 law’s application
is thus the date of the filing of an action or proceeding, not the date of the oral
agreement.


 See id. The 1995 act’s effective date was September 1, 1995. See id.,
§ 20, 1995 Tex. Gen. Laws at 4787. This suit was not filed until 1997. Accordingly,
former section 8.319, which had been repealed by the time that suit was filed, does
not apply.
          The Legislature replaced former section 8.319 in 1995 with current section
8.113. See id., § 1, 1995 Tex. Gen. Laws at 4767. Section 8.113 provides:
A contract or modification of a contract for the sale or purchase of a
security is enforceable whether or not there is a writing signed or record
authenticated by a party against whom enforcement is sought, even if the
contract or modification is not capable of performance within one year
of its making.

Tex. Bus. & Com. Code Ann. § 8.113 (Vernon 2002). Therefore, even if Elliott
were correct that the statute-of-frauds provision applicable to securities sales applies
to the oral agreement underlying the first fraud, current section 8.113 would apply,
not former section 8.319. Section 8.113 exempts securities sales from the statutes of
frauds entirely, even if the contract is not performable within one year of its making. 
See id.
          For these reasons, we reject Elliott’s claim that former section 8.319, or any
statute-of-frauds provision specially applicable to securities sales, precludes
enforcement of the oral agreement to give Whitten 25% of I-Star’s stock.
                    b.       Business and Commerce Code Section 26.01
          Elliott next argues that Business and Commerce Code section 26.01 makes the
oral contract unenforceable because the agreement was allegedly unperformable
within a year. See Tex. Bus. & Com. Code Ann. § 26.01. Section 26.01 provides
in pertinent part:
(a)A promise or agreement described in Subsection (b) of this
section is not enforceable unless the promise or agreement, or a
memorandum of it, is
 
(1)in writing; and
 
(2)signed by the person to be charged with the promise or
agreement or by someone lawfully authorized to sign for him.
 
(b)Subsection (a) of this section applies to: . . .
 
(6)an agreement which is not to be performed within one year
from the date of making the agreement; . . . .

Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(6).
          When the time for performance of a contract is uncertain and performance can
conceivably occur within one year, the statute of frauds does not apply. Miller v.
Riata Cadillac Co., 517 S.W.2d 773, 775 (Tex. 1974); Iacono v. Lyons, 16 S.W.3d
92, 95 (Tex. App—Houston [1st Dist.] 2000, no pet.). “If performance within a year
is a possibility that is consistent with the provisions of the agreement, the fact that
performance within one year is not required or expected does not bring the contract
within the statute of frauds.” Walker v. Tafralian, 107 S.W.3d 665, 669 (Tex.
App.—Fort Worth 2003, pet. denied); Iacono, 16 S.W.3d at 95. That is, section
26.01(b)(6) does not apply if the contract, from its terms, could possibly be performed
within a year, however improbable performance within one year might be. Iacono,
16 S.W.3d at 95.
          It is undisputed that the oral employment agreement containing the promise of
stock was not for a definite term. Elliott relies solely on the following testimony from
Whitten’s deposition:
Question:“But my point is, you just said that everybody understood
[that] while [the oral consulting agreement underlying the
first fraud] may not be forever [in its duration], it would be
at least for a couple of years that you intended to fulfill
some obligation to the company to work even on a
consulting basis. Correct?
 
Answer:Correct.

This testimony does not conclusively prove that Whitten’s consulting work or
employment could not have been completed within a year. See Miller, 517 S.W.2d
at 775; Iacono, 16 S.W.3d at 95. Moreover, Whitten also testified that the parties
“did not determine an ending period” for the oral consulting agreement and that he
never assumed that that agreement was “for perpetuity,” and he disagreed with the
statement that that agreement contemplated a duration of at least more than one year. 
Accordingly, we hold that the record does not conclusively show that section
26.01(b)(6) applies to the oral agreement underlying the first fraud.
          Because that oral agreement was not barred under either statute-of-frauds
theory advanced by Elliott, Haase’s prohibition does not apply. 
          We overrule issue one.
 
B.      Challenges to the Jury’s Verdict on Liability
          In issue two, Elliott argues that the evidence was legally and factually
insufficient to support the jury’s verdict on liability (jury question two).
          1.       Standards of Review
          Whitten had the burden of proof on his fraudulent-inducement claims. 
Accordingly, to prevail on his legal-sufficiency challenge, Elliott must demonstrate
that there is no evidence to support the jury’s relevant answers. See Croucher v.
Croucher, 660 S.W.2d 55, 58 (Tex. 1983). In our review, we consider all evidence
in the light most favorable to the prevailing party, indulging every reasonable
inference in that party’s favor, and disregard all evidence and inferences to the
contrary. Assoc. Indem. Corp. v CAT Contracting, Inc., 964 S.W.2d 276, 285-86
(Tex. 1998). If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. Formosa Plastics Corp. USA v. Presidio Engineers &
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).
           To prevail on his factual-sufficiency challenge, Elliott must demonstrate that
there is insufficient evidence to support the finding. See Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986) . In our review, we consider and weigh all of the evidence, and
we will set aside the verdict only if the evidence that supports the finding is so weak
as to render the finding clearly wrong and manifestly unjust. See id.
          2.       Sufficiency of the Evidence
          Elliott argues that there was legally and factually insufficient evidence of each
element of the first fraud relating to liability. Given our disposition below, we need
consider only Elliott’s legal-sufficiency challenge under this issue.
          “Texas law has long imposed a duty to abstain from inducing another to enter
into a contract through the use of fraudulent misrepresentations.” Formosa Plastics,
960 S.W.2d at 46. To show fraud, a plaintiff must show a material misrepresentation
that was either known to be false when it was made or was asserted without
knowledge of its truth and that was intended to be acted upon, that was actually relied
upon, and that caused injury. Id. at 47. A promise of future performance is an
actionable misrepresentation if, at the time that he made the promise, the maker had
no intention of performing the promise. Id. at 48. Intent to deceive is a fact question
uniquely within the realm of the factfinder because it depends on witnesses’
credibility and the weight to be given their testimony. Spoljaric v. Percival Tours,
708 S.W.2d 432, 434 (Tex. 1986). 
          Because intent to defraud cannot normally be shown by direct proof, that intent
must usually be proved by circumstantial evidence. Spoljaric, 708 S.W.2d at 435. 
Such circumstantial evidence may include the party’s subsequent acts, even though
the party’s relevant intent is his intent at the time that he made the misrepresentation. 
Spoljaric, 708 S.W.2d at 434. For example, although the mere failure to perform a
contract, standing alone, is not evidence of fraud,


 the subsequent failure to perform
“is a circumstance to be considered with other facts to establish intent.” Spoljaric,
708 S.W.2d at 435. “‘Slight circumstantial evidence’ of fraud, when considered with
the breach of promise to perform, is sufficient to support a finding of fraudulent
intent.” Id. Similarly, a party’s denial that he ever made the promise may be a factor
showing no intent to perform when he made the promise. Id. 
          Jury question two provided as follows:
QUESTION NO. 2
 
Did William H. Elliott, Jr. commit fraud against Stephen Whitten
in connection with the promise, if any, to give him a 25% equity interest
(stock) in InterStar Systems, Inc.?

Instructions
 
Fraud occurs when—
 
a.a party makes a material misrepresentation,
 
b.the misrepresentation is made with knowledge of its falsity or
made recklessly without any knowledge of the truth and as a
positive assertion,
 
c.the false representation is made to a person for the purpose of
inducing that person to enter into a contract,
 
d.the misrepresentation is made with the intention that it should be
acted on by the other party, and
 
e.the other party acts in reliance on the misrepresentation and
thereby suffers injury.
 
A promise to do an act in the future is actionable fraud when
made with the intention, design and purpose of deceiving, and with no
intention of performing the act.
 
While a party’s intent is determined at the time the party made the
representation, it may be inferred from the party’s subsequent acts after
the representation is made. Failure to perform, standing alone, is no
evidence of the promissor’s intent not to perform when the promise is
made. However, that fact is circumstantial evidence to be considered
with other facts to establish intent. A party’s denial that he ever made
a promise is a factor showing no intent to perform when he made the
promise.
 
“Misrepresentation” means—
 
(a) a false statement of fact, or (b) a promise of future performance made
with an intent not to perform as promised.
 
Answer “Yes” or “No.”
 
ANSWER: Yes 
 
                    a.       Material misrepresentation and knowledge of falsity
          Elliott argues that no evidence supports the jury’s implicit determination that
Elliott made the oral agreement to give Whitten stock with an intent not to perform
or with knowledge of the statement’s falsity. We disagree. We first note that Elliott’s
claim that Whitten testified that the parties discussed the stock issue for over a year
without resolution is incorrect: Whitten actually testified that the parties agreed to the
stock-for-work arrangement in October 1994 and that they repeatedly talked about
the deal or Whitten’s stock ownership for over a year afterwards. Although Elliott
is correct that, under the charge, his failure to perform on, and his denial of the
existence of, the stock-for-work agreement cannot by itself constitute evidence of
intent not to perform, that evidence did not stand alone. Rather, viewed in the
appropriate light, Whitten presented other circumstantial evidence of Elliott’s intent
not to perform: Whitten (1) produced memoranda from Whitten to Elliott asserting
Whitten’s equity interest in I-Star, along with Elliott’s admission that he did not, at
least in writing, correct Whitten’s stated impression of having equity in I-Star; (2)
presented evidence that the parties repeatedly talked about the stock-for-work deal
or Whitten’s stock ownership for over a year after the agreement’s making; (3)
testified that Elliott had told Whitten to keep the oral agreement underlying the first
fraud confidential, without reducing it to writing; (4) presented evidence that Whitten
could not afford to work for $1,000 per week (the rate under the parties’ initial two-week agreement), Whitten thus proposed working as I-Star’s exclusive manufacturer
with additional compensation of $2,500 per week, Elliott rejected the $2,500-per-week offer because (among other things) Elliott could not afford it, Elliott
nonetheless wanted Whitten’s consulting work, and, shortly after the $2,500-per-week proposal fell through, the parties agreed to the $1,000-per-week-plus-stock
arrangement; and (5) seriously impeached Elliott’s veracity on various matters
relating to the parties’ relationship and agreements. Accordingly, we hold that there
was legally sufficient circumstantial evidence to support the jury’s implicit finding
that Elliott made a material misrepresentation that he knew was false.
                    b.       Misrepresentation made for the purpose of inducing Whitten
into a contract

          Elliott argues that no evidence supports the jury’s implicit determination that
Elliott committed the first fraud with the intent of inducing Whitten into a contract. 
Elliott’s focus under this challenge is not on evidence of his intent to induce Whitten
into a contract, but instead on evidence of the contract itself. Specifically, Elliott
relies on Whitten’s deposition testimony that no writing signed by I-Star or Elliott
reflected the oral agreement underlying the first fraud. This argument parallels
Elliott’s earlier argument under Haase that the oral contract underlying the first fraud
was unenforceable, and we reject it for the reasons discussed with respect to that
challenge. Moreover, Whitten’s theory of the case was that the contract into which
Elliott induced him to enter by the first fraud was a contract of continued employment
with I-Star for a particular weekly fee, not, as Elliott separately implies, a contract to
sell stock. Accordingly, we hold that the evidence supporting the jury’s implicit
determination that Elliott committed the first fraud with the intent of inducing
Whitten into a contract is not legally insufficient for the reasons that Elliott argues.
                    c.       Intent that Whitten act upon the misrepresentation
          Elliott argues that no evidence supports the jury’s implicit determination that
Elliott committed the first fraud with the intent that Whitten rely on the
misrepresentation. In addition to the circumstantial evidence cited above concerning
Elliott’s intent not to perform, the record showed that Elliott needed Whitten’s
assistance and that he could not afford Whitten’s proposal that Elliott pay him $2,500
per week, which Whitten made a few weeks before the parties made the oral
agreement underlying the first fraud. Together, this was some circumstantial
evidence that Elliott misrepresented that Whitten had equity in I-Star so that Whitten
would stay for the lesser weekly amount that Elliott could afford to pay him. 
Accordingly, we hold that there was legally sufficient evidence to support the jury’s
implicit finding that Elliott committed the first fraud intending that Whitten rely on
his misrepresentation.
                    d.       Detrimental reliance
          Elliott argues that no evidence supports the jury’s implicit determination that
Whitten detrimentally relied on the oral agreement underlying the first fraud. To the
extent that Elliott’s argument is a rehashing of his argument under Haase, we reject
it for the reasons already stated. Additionally, Whitten testified that he relied on the
oral stock-for-work agreement, that he would not have continued working for I-Star
had Elliott not promised him equity in I-Star, and that he could have made more
money elsewhere or would have asked for more money from I-Star had he not been
promised equity in I-Star. Accordingly, we hold that there was legally sufficient
evidence to support the jury’s implicit finding that Whitten detrimentally relied on the
oral agreement underlying the first fraud. 
          We overrule Elliott’s issue two to the extent that Elliott raises a legal-sufficiency challenge.
C.      Challenges to the Jury’s Verdict on Damages
          In part of issue three, Elliott argues that the trial court erred in refusing to
instruct the jury on the measure of damages. In the remainder of issue three, Elliott
alternatively argues that the jury’s award of actual damages for the first fraud is not
supported by legally or factually sufficient evidence. 
          1.       The Charge and the Verdict
          The jury found $375,000 in damages in response to the following question:
 If your answer to Question No. 2 is “Yes,” then answer the following
question, otherwise do not answer the following question.

QUESTION NO. 3
 
What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate Stephen Whitten for his damages, if any, that
were proximately caused by the fraud in connection with the promise to
give Stephen Whitten a 25% equity interest (stock) in InterStar Systems,
Inc.?

Instructions
 
Do not include interest on any amount of damages you find.
 
Answer in dollars and cents for damages, if any:
 
ANSWER: $ 375,000

          A claimant may recover benefit-of-the-bargain damages or out-of-pocket
damages for fraudulent inducement. See Formosa Plastics Corp. USA, 960 S.W.2d
at 49. The out-of-pocket measure of damages allows recovery for the actual injury
suffered, which is measured by the difference in the value of that with which the party
has parted and the value of that which he has received. Id. The measure of benefit-of-the-bargain damages is the difference between the value as represented and the
value received. Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 682 (Tex. 2000).
Jury question three contained no instruction limiting the measure of damages to either
theory.
          2.       Whitten’s Theories of Damages
          Whitten sought, as alternatives, both out-of-pocket damages and benefit-of-the-bargain damages. His theories of damages for the first fraud were as follows:
a.His benefit-of-the-bargain damages would be the value of the
stock that Whitten claimed that he should have received under the
oral agreement.
 
b.His out-of-pocket damages would be the difference between what
Whitten actually received working for I-Star and the fair-market
value of his services had he not been tricked into continuing work
for I-Star for less money.




          Elliott asserts that Whitten abandoned or waived his out-of-pocket recovery
theory. We set out the applicable record to show why we disagree. Whitten’s “live”
pleadings alleged both a quantum meruit claim to recover “the reasonable value of his
services” and a fraud claim, for which Whitten alleged that he was seeking the value
of the stock as damages. However, during the directed-verdict discussion, Whitten
clarified that the only measure of damages that he sought for the first fraud was the
out-of-pocket measure and that he sought the stock’s value only for the second fraud. 
During the charge conference, Whitten at first requested that the damages question
for the first fraud define the measure of damages in terms of what appears to be
benefit of the bargain; however, Whitten ultimately requested that the first fraud’s
measure of damages be defined as both benefit of the bargain and out of pocket, and
the trial court refused that request, instead allowing counsel to argue evidence
supporting their theories of damages during closing argument. In closing argument,
the only evidence concerning actual damages that Whitten discussed was the stock’s
value, which is a benefit-of-the-bargain measure. However, I-Star’s counsel then
discussed the sufficiency of Whitten’s evidence concerning his earning capacity (an
out-of-pocket measure). 
          Given that the jury question contained no instruction on the measure of
damages, and that Whitten’s evidence and arguments to the court supported both
damages measures, we do not construe Whitten’s failure to mention evidence of out-of-pocket damages during closing argument as a waiver of that measure of damages. 
See Robinson v. Robinson, 961 S.W.2d 292, 300 (Tex. App.—Houston [1st Dist.]
1997, no writ) (holding that waiver is intentional relinquishment of known right or
intentional conduct inconsistent with intent to claim that right). We further disagree
with Elliott that Whitten necessarily abandoned out-of-pocket damages for fraudulent
inducement when he withdrew his quantum meruit claim. Quantum meruit and
fraudulent inducement are different causes of action. In abandoning an alternative
claim of quantum meruit, Whitten did not also abandon an out-of-pocket recovery
theory under his independent fraudulent-inducement claim. Compare Vorrt
Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990), and Truly
v. Austin, 744 S.W.2d 934, 938 (Tex. 1988) (setting out quantum meruit elements or
noting that quantum meruit is remedy independent of contract) with Formosa Plastics
Corp. USA, 960 S.W.2d at 46 (setting out fraudulent-inducement elements and noting
that fraudulent-inducement-to-contract claim requires existence of contract).
          3.       Total Failure to Instruct the Jury on the Measure of Damages
          Elliott first argues that the trial court erred in failing to instruct the jury on the
appropriate measure of damages. 
          “Damages must be measured by a legal standard, and that standard must be
used to guide the fact finder in determining what sum would compensate the injured
party.” Jackson v. Fontaine’s Clinics, Inc., 499 S.W.2d 87, 90 (Tex. 1973). The
court’s charge should limit the jury’s consideration to facts that are properly part of
the allowable damages. Allied Vista, Inc. v. Holt, 987 S.W.2d 138, 141 (Tex.
App.—Houston [14th Dist.] 1999, pet. denied). A jury question that fails to guide the
jury on any proper legal measure of damages is fatally defective. Jackson, 499
S.W.2d at 90. However, a party complaining of a damages instruction that is entirely
omitted must preserve that error. See Tex. R. Civ. P. 278. A party who does not
properly preserve a challenge to the total omission of a jury instruction may not
complain of the error on appeal; in such cases, we review the sufficiency of the
evidence based upon the charge submitted, even if erroneous. See F.S. New Prods.,
Inc. v. Strong Indus., Inc., 129 S.W.3d 606, 625 (Tex. App.—Houston [1st Dist.]
2004, pet. filed) (holding same, when challenge to lack of instruction on measure of
damages was not preserved).
          Elliott did not argue below that the total failure to submit any instruction on
damages was error for the reason that it left the jury to speculate—his specific
appellate complaint—and he at first implied that the court could omit any instruction
if it chose not to include an instruction on benefit-of-the-bargain damages.


 
However, by the time that the trial court ruled on the damages instruction, Elliott had
specifically requested a benefit-of-the-bargain instruction. This sufficed to advise the
trial court that the question was flawed because it omitted an instruction on the
measure of damages. Cf. Tex. Dep’t of Human Servs. v. Hinds, 904 S.W.2d 629, 637-38 (Tex. 1995) (holding that proposed written instruction, although not substantially
correct, nonetheless preserved error because, among other things, it called trial court’s
attention to missing element). Therefore, Elliott’s appellate complaint sufficiently
comports with his trial objection to avoid waiver for that reason.
          Elliott waived his challenge for another reason, however. Elliott did not submit
a written instruction on the measure of damages. Instead, Elliott verbally requested
an instruction on benefit-of-the-bargain damages and referred to the pattern jury
charge for that instruction. See Texas Pattern Jury Charges PJC 110.3, Sample
A (7th ed. 2002). “Failure to submit a definition or instruction shall not be deemed
a ground for reversal of the judgment unless a substantially correct definition or
instruction has been requested in writing and tendered by the party complaining of
the judgment.” Tex. R. Civ. P. 278 (emphasis added). The submission must be made
before the charge is submitted to the jury. F.S. New Prods., Inc., 129 S.W.3d at 624-25 (holding that challenge to omission of instruction on measure of damages has to
be raised before submission to jury to be preserved).
          Over a decade ago, the Supreme Court began relaxing the rules concerning
preserving charge error in certain contexts. See State Dep’t of Highways & Pub.
Transp. v. Payne, 838 S.W.2d 235, 239-41 (Tex. 1993); see also Galveston County
Fair & Rodeo, Inc. v. Glover, 940 S.W.2d 585, 586 (Tex. 1996); Lester v. Logan, 907
S.W.2d 452, 453 (Tex. 1995); Alaniz v. Jones & Neuse, Inc., 907 S.W.2d 450, 451-52
(Tex. 1995); Hinds, 904 S.W.2d at 638 (all following Payne). In Payne, the trial
court gave the jury an erroneous broad-form negligence question that omitted an
element of the proper legal theory. See id. at 238-39. The State objected to the
charge and also requested a question on the omitted element. See id. at 239. The
court noted that even if the State’s objection was insufficient, its requested question
preserved error by sufficiently calling the trial court’s attention to the State’s
complaint that the missing element, and thus the proper legal theory, had not been
submitted to the jury. See id. at 239-40. The Payne court held, “There should be but
one test for determining if a party has preserved error in the jury charge, and that is
whether the party made the trial court aware of the complaint, timely and plainly, and
obtained a ruling. The more specific requirements of the rules should be applied . . .
to serve rather than defeat this principle.” Id. at 241. However, the Payne court
expressly stated that it adhered to the rule that “we do not revise our rules by
opinion.” Id.
          The Payne court considered whether a submitted question could function as an
objection to an erroneous jury question, on which the opposing party relied, that
omitted an element of the proper legal theory. See id. at 239-41; see also Alaniz, 907
S.W.2d at 451-52 (applying Payne and Rule of Civil Procedure 273 to determine that
party with burden to submit question had preserved error to court’s refusal to submit
question on damages); Glover, 940 S.W.2d at 586 (applying Payne to hold that party
without burden to submit question sufficiently preserved error concerning defective
question by tendering written questions and accompanying instructions). Although
the Payne court relaxed the standard for preserving charge error, it also refused to
rewrite the rules judicially. Payne, 838 S.W.2d at 241. Then as now, the rules allow
objections to be made in writing or orally, and the rules also provide that an objection
suffices to preserve error concerning a trial court’s failure to submit a jury question
upon which the opposing party relies and that thus might result in a deemed finding
under Rule of Civil Procedure 279. See Tex. R. Civ. P. 272, 278; Gilgon, Inc. v.
Hart, 893 S.W.2d 562, 566 (Tex. App.—Corpus Christi 1994, writ denied). Nothing
in these rules expressly prohibits a written request’s substituting for an objection;
therefore, the Payne court could simultaneously make the preservation rules more
flexible (one of its stated goals) without rewriting the rules judicially (its other stated
goal). 
          In contrast, the part of rule 278 applicable to instructions—as opposed to that
portion of the rule concerning questions—requires that challenges to instructions’
omission be preserved by written submission in substantially correct form “by the
party complaining of the judgment” (potentially Elliott or Whitten), not only by the
party relying on the related question (only Whitten).


 Tex. R. Civ. P. 278. Because
rule 278 expressly requires a written submission to preserve error concerning an
omitted instruction, our allowing a verbal objection or an oral recitation of the
instruction in lieu thereof would rewrite rule 278 judicially, in contravention of
Payne. See Payne at 241. This Court has previously distinguished Payne to hold just
this. See Mason v. S. Pac. Transp. Co., 892 S.W.2d 115, 117 (Tex. App.—Houston
[1st Dist.] 1994, writ denied) (holding that plaintiff waived complaint about omission
of instruction when he objected to omission, but did not submit written instruction as
required by rule 278; distinguishing Payne because of rule’s plain language); see also
Harris County Flood Control Dist. v. Glenbrook Patiohome Owners Ass’n, 933
S.W.2d 570, 580 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (without
mentioning Payne, holding that plaintiff’s reading of instruction into record did not
preserve error under rule 278). Since Payne, other courts have held that “if omission
[of an instruction or definition] from a question is error that might be the subject of
either party’s appeal, . . . the rules [require] that the complaining party must have . . .
tendered remedial language” in writing to preserve error. Hart, 893 S.W.2d at 566
(emphasis added) (distinguishing Payne to so hold, when defendant had only orally
objected to omission of instruction).


 Under this authority, an oral objection or the
reading of the instruction into the record, by itself, will not preserve error, even after
Payne. See Fairfield Estates L.P. v. Griffin, 986 S.W.2d 719, 724 (Tex.
App.—Eastland 1999, no pet.) (holding that defendants waived complaint about trial
court’s failure to submit instruction on measure of damages, despite defendants’
having objected and orally requested inclusion of instruction); Glenbrook Patiohome
Owners Ass’n, 933 S.W.2d at 580 (holding that objection and reading instruction into
record did not preserve error under rule 278). We follow these courts and hold that
Elliott has waived his appellate challenge for this reason.
          We overrule this portion of issue three.
          4.       Sufficiency of the Evidence Showing Benefit-of-the-Bargain
Damages

          Elliott next contends that there was no evidence of benefit-of-the-bargain
damages, i.e., the value of the stock at the time of the first fraud.


 We review for
some evidence of the stock’s value at any time prior to the spring of 1996.


 Cf.
Pabich, 71 S.W.3d at 509 (“[W]hen calculating the value of stock in order to
determine the amount of damages to award an injured party who had an ownership
interest in the corporation, evidence of the value of the corporation at the time the
alleged injury occurred is required.”).
          Whitten presented no expert testimony of the value of the stock that he
received. Viewed in the appropriate light, the only evidence relating to the stock’s
value was as follows. Elliott testified that, in either 1996 or 1997, he had offered
Whitten 25% of I-Star’s stock for $500,000, which offer Whitten did not accept.


 In
about March 1996, Elliott told Whitten that a prospective purchaser was going to
offer $6 million for 40% of I-Star, but that deal fell through. In 1996, I-Star was in
“serious” and “desperate” need of cash. To remedy the problem, Elliott sought
outside investors, telling one of them that I-Star was worth $5 million. In a private
placement that occurred in January of 1997, 12 investors paid either $1.875 or $2.185
million for between 46% and 49% of I-Star’s stock. At least $1 million of that sum
was used to pay off I-Star’s debts the same month. By June of 1997, I-Star had
insufficient working capital to continue operations, it was questionable whether I-Star
would survive, and I-Star’s situation was “beyond the point of redemption” by new
sales or business. I-Star never paid any dividends to its stockholders. 
          We hold that this is no evidence of the value of the stock before the second
fraud in the spring of 1996. I-Star was a closely held corporation. “There can be no
cash market value of corporate stock where it has not been sold in sufficient
quantities to establish a prevailing sales price.” Roberts v. Harvey, 663 S.W.2d 525,
528 (Tex. App.—El Paso 1983, no writ). There is no evidence that I-Star’s stock was
sold until January 1997, months after Whitten had released his stock in the spring of
1996. Cf. Pabich v. Kellar, 71 S.W.3d 500, 509 (Tex. App.—Fort Worth 2002, pet.
denied) (holding that evidence of closely held corporation’s stock value before and
after torts sued upon was no evidence of its value at time of torts, when jury charge
asked for value on date of torts). Additionally, because fair-market value generally
requires a willing, uncoerced offer and acceptance,


 testimony concerning
unconsummated offers to sell or to buy I-Star’s stock is no evidence of the stock’s
fair-market value. See Roberts v. Burkett, 802 S.W.2d 42, 46 (Tex. App.—Corpus
Christi 1990, no pet.) (concerning stock); Southwestern Bell Tel. Co. v. Wilson, 768
S.W.2d 755, 762 (Tex. App.—Corpus Christi 1988, writ denied) (concerning closely
held stock); see also Lee v. Lee, 47 S.W.3d 767, 785 (Tex. App.—Houston [14th
Dist.] 2001, pet. denied).
          “In the absence of testimony or evidence of a reasonable cash market value of
corporate stock, the method employed in determining the worth or value of such stock
is to determine the difference between the value of the assets and the amount of
liabilities of the corporation.” Harvey, 663 S.W.2d at 528; accord Pabich, 71 S.W.3d
at 509; Williams, 943 S.W.2d at 193; Mercantile Bank & Trust, Inc. v. Cunov, 749
S.W.2d 545, 549 (Tex. App.—San Antonio 1988, writ denied). Whitten directs us
to no evidence concerning the value of I-Star’s assets, and the only possibly evidence
of liabilities was that I-Star had around $1 million of debts and was in serious need
of capital in 1996 to continue functioning. This is no evidence to support the jury’s
verdict of $375,000 in damages.
          Accordingly, the jury’s verdict can in no way be supported under a theory of
benefit-of-the-bargain damages. See Burkett, 802 S.W.2d at 46 (in suit by employee
arising out of unfulfilled promise to pay employee weekly salary plus 25% equity in
closely held corporation, holding that trial court erred in asking jury to determine fair-market value of stock, when no relevant evidence of that value existed, and when
principal evidence was unaccepted offer to sell some corporate assets to employee). 
We sustain issue three to the extent that Elliott argues that there is no evidence of
benefit-of-the-bargain damages.
          5.       Sufficiency of the Evidence Showing Out-of-Pocket Damages

          We also understand Elliott to challenge the legal and factual sufficiency of the
evidence showing out-of-pocket damages, i.e., the fair-market value of Whitten’s
services while at I-Star, less what he was actually paid there.


 Following is the
evidence, viewed in the most favorable light, concerning Whitten’s out-of-pocket
damages. Whitten testified that the “fair value of [his] services while [he] worked at
[I-Star]” was $991,000, that I-Star paid him a little over $120,000, and that the
difference between the two values was about $871,000. Whitten did not in any way
explain the basis for this conclusory testimony of his out-of-pocket damages.


 Other
than this conclusory testimony, there was also evidence that, when Whitten consulted
for Lanax on unspecified dates, he charged $75 per hour, plus expenses and a 20%
commission on each sale. Whitten and Elliott agreed at first that Whitten would work
for two weeks at $1,000 per week; when the two-week term ended, Whitten proposed
$2,500 per week, plus expenses, which Elliott did not accept. Sometime in or shortly
after the fall of 1994, the parties agreed that Whitten would receive $1,000 per week,
plus 25% of I-Star’s stock. Whitten sometimes worked 14- or 16-hour days for I-Star,
and occasionally worked double shifts, as needed; there is no testimony, however, of
the total hours that he worked for I-Star. When Whitten resigned in November 1996,
Elliott told him that he would receive a $200 royalty on “everything [I-Star] sold” for
two years, plus a $150-per-hour consulting fee. I-Star later unilaterally changed the
royalty to $100 for three years. In any event, Whitten never received any $200
royalties from I-Star. Whitten later agreed, at I-Star’s request, to reduce his
consulting billing to $50 per hour, with the understanding that he would be
reimbursed the difference between $150 and $50 per hour later. Whitten was also to
receive from Lanax a $200 royalty or commission on certain of its custom-designed
equipment that I-Star would order and 5% of gross sales on other equipment of
Lanax’s.
          The fact finder may believe all, some, or none of a witness’s testimony and,
generally speaking, is not required to believe even the witness’s uncontradicted
testimony. Hill v. Clayton, 827 S.W.2d 570, 574 (Tex. App.—Corpus Christi 1992,
no writ). “As a general rule, the fact finder has broad discretion in assessing damages
when the law provides no precise legal measure.” First State Bank v. Keilman, 851
S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied). We will not disregard the
jury’s damages finding merely because the jury’s reasoning in reaching its figures is
unclear. Id. Additionally, a jury has discretion to award damages within a range of
evidence presented, as long as a rational basis exists for the jury’s damages
calculation. “A jury may not, however, arbitrarily assess an amount neither
authorized nor supported by the evidence presented at trial.” Id. “In other words, a
jury may not ‘pull figures out of a hat’; a rational basis for calculation must exist.” 
Id. (quoting Neiman-Marcus Group, Inc. v. Dworkin, 919 F.2d 368, 372 (5th Cir.
1990)). “A jury’s finding [on damages] may be disregarded if the amount ‘was not
the result of a deliberate and conscientious conviction in the minds of the jury and the
court.’” Keilman, 851 S.W.2d at 930-31 (quoting Mills v. Jackson, 711 S.W.2d 427,
431 (Tex. App.—Fort Worth 1986, no writ)).
          Because the damages question lacked any instruction on the measure of
damages, we hold that, viewed in the appropriate light, Whitten’s conclusory
testimony of the “fair value” of his services was some evidence that their fair-market
value was at least the $375,000 found by the jury, assuming that the jury did not
believe his $991,000 valuation entirely. However, we hold that the evidence was
factually insufficient to support the jury’s finding. Whitten’s conclusory testimony
gave the jury no basis for calculating anything but the $871,000 ($991,000 value less
$120,000 paid) to which he testified without speculation. Contrary to Whitten’s
argument by post-submission brief, the jury could not simply divide the $871,000
figure by one of the three hourly contract rates that Whitten had charged ($50, $75,
and $150) because Whitten’s hourly rate was always coupled with some additional
form of remuneration: royalties, commissions, expenses, or some combination of the
three. There was no testimony of the total hours that Whitten worked for I-Star. 
There was no range of damages inside of which the jury could pick a figure. Neither
was there evidence of the fair-market value of comparable services at similar times
and in similar circumstances in the relevant market. There was simply nothing
besides Whitten’s conclusory statement that could sufficiently guide the jury in
calculating damages to avoid speculation. Indeed, the jury’s answers of $375,000 and
$125,000 for the first and second frauds together totaled $500,000—the sum that
Whitten argued could be considered the stock’s value, but that was no evidence of its
value. Given the paucity of evidence that Whitten presented, the jury—albeit
understandably—appears to have been left to pull a figure out of a hat, without any
rational basis to support its finding. Cf. Keilman, 851 S.W.2d at 930-31. 
          Accordingly, we hold that the evidence supporting the jury’s damage finding
for the first fraud is so weak as to render the finding clearly wrong and manifestly
unjust. See Cain, 709 S.W.2d at 176; cf. Keilman, 851 S.W.2d at 931 (holding
evidence factually insufficient to support jury’s finding of amount of unauthorized
interest—a calculation analogous to damages calculation—when finding appeared to
have pulled out of a hat).



          We overrule the portion of issue three arguing that the evidence is legally
insufficient, but we sustain the portion of issue three arguing that the evidence was
factually insufficient.
D.      Elliott’s Remaining Challenges
          Given our disposition of Elliott’s issue three, we need not reach his issue four,
in which Elliott argues that the trial court erred in denying a new trial because of
Whitten’s incurable closing argument; his issue five, in which Elliott argues that the
trial court erred in awarding Whitten pre-judgment interest; and the portion of his
issue two, in which he argues that factually insufficient evidence supported the jury’s
liability determination.
Whitten’s Appeal
          In the sole issue in his appeal, Whitten argues that the trial court erred in
granting Elliott’s motion for JNOV on the jury’s answer awarding exemplary
damages against Elliott personally. Given our disposition of Elliott’s appeal, we need
not reach this issue under Whitten’s appeal. See Williams, 943 S.W.2d at 194
(holding that appellate court’s setting aside award on basis of actual damages requires
setting aside exemplary damages, as well).

Conclusion
          We affirm those portions of the judgment (1) rendering judgment on Whitten’s
claims against I-Star, (2) rendering judgment on I-Star’s claims, and (3) expressly or
implicitly denying any party’s request for attorney’s fees. We reverse the judgment
of the trial court in all other respects and remand the cause for further proceedings.
 
 
                                                             Tim Taft
                                                             Justice

Panel consists of Justices Taft, Jennings, and Hanks.